**Bret Howard REBER, Appellant**

v.

**Andrea Lynn REISS.**

Superior Court of Pennsylvania.

Argued Jan. 11, 2012.

Filed April 11, 2012.

Elizabeth A. Gardiner, Philadelphia, for appellant.

Cheryl A. Young, Norristown, for appellant.

BEFORE: PANELLA, LAZARUS, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:

Bret Howard Reber (Husband) appeals from the final divorce decree and order of equitable distribution in which the trial court awarded Andrea Lynn Reiss (Wife) the frozen pre-embryos [1] created from Husband's sperm and Wife's eggs. Upon review, we affirm.

Husband and Wife were married on October 12, 2002. The trial court summarized the relevant facts as follows.

In November 2003, Wife, at the age of 36, was diagnosed with breast cancer. As a result of the diagnosis and proposed recommended cancer treatments, the parties were advised to undergo *in vitro* fertilization ("IVF") to preserve Wife's ability to conceive a child.[2] To

---

* Retired Senior Judge assigned to the Superior Court.

1. "It is at this stage of *in vitro* fertilization (IVF) that a doctor would implant the embryos into a woman's uterus." Molly Miller, *Embryo Adoption: The Solution to an Ambiguous Intent Standard,* 94 Minn. L.Rev. 869, 874 (2010).

2. IVF "refers to the combination of male and female gametes to produce a zygote, or fertilized egg, outside the body, which can be transferred into the uterus or Fallopian tubes ... of a woman, not necessarily the ovum provider, and gestated to term." 17 Joanne Ross Wilder, WEST'S PENNSYLVANIA LAW FAMILY PRACTICE AND PROCEDURE § 26:3 (7th ed. 2008) (Wilder).

accommodate the IVF process, Wife deferred the commencement of her cancer treatment for several months.[3] In February and March 2004, Husband and Wife underwent the IVF process resulting in the production of thirteen pre-embryos using Husband's sperm and Wife's eggs.[4]

\* \* \*

Following fertilization, the pre-embryos were then cryopreserved and presently remain frozen and stored with Reproductive Science Institute of Suburban Philadelphia, P.C. ("RSI").

After undergoing the IVF process, Wife proceeded with extensive breast cancer treatments including two surgeries, eight rounds of chemotherapy and 37 rounds of radiation. Wife has undergone testing with regard to her ability to have children since her recovery from cancer and testified that she "was lead [sic] to believe that I cannot have children myself as I am."

On December 28, 2006, Husband filed a Complaint in Divorce. Husband subsequently developed a relationship with another woman and on January 18, 2008, approximately 18 months after he and Wife separated, Husband's biological son was born with this other women [sic]. Husband testified that this child was conceived intentionally and that he intends to have more children.

Wife, now age 44, has no children. Wife seeks all thirteen pre-embryos for implantation. The parties agree, as does the [trial] court, that the pre-embryos are marital property subject to equitable distribution.

Husband filed an Amended Complaint in Divorce on July 7, 2008. Service of the Complaint was accepted on January 26, 2009. Husband filed an Affidavit under Section 3301(d) on July 23, 2008. The marriage of the parties is irretrievably broken and the parties have lived separate and apart for a period in excess of two years.

[Husband] filed a Motion for the Appointment of a Special Master on January 27, 2009. Master Lynn Snyder was appointed on February 9, 2009 and held a preliminary conference on February 23, 2009. Master Snyder held a settlement conference on May 14, 2009. The case did not settle and a certificate of trial readiness was filed on May 14, 2009. The trial was conducted on February 22, 2010 before Master Snyder.

On August 11, 2010, Master Snyder filed an Amended Report and Recommendation addressing the distribution of the parties' pre-embryos. [That report provided, in relevant part, that "the pre[-]embryos be awarded to Husband, who shall direct RSI that the pre-embryos be destroyed and discarded forthwith." Master's Amended Report, 8/11/2010, at 18.] Wife filed one Exception to the Master's Amended Report on August 25, 2010, [which related to the disposition of the pre-embryos]. Wife filed a Brief in Support of Exceptions on October 20, 2010. Husband filed a Brief in Response to [Wife's] Brief in Support of Wife's Exceptions on November 3, 2010. On November 10, 2010, the [trial court] heard oral argument on Wife's exception.

---

**3.** We note that Wife testified that she delayed commencement of her cancer treatments for two to three weeks. N.T., 2/22/2010, at 57.

**4.** "Cryopreservation of human sperm is a well-established technique. Cryopreservation of human eggs is also possible; however, the survival rate of eggs after the freezing and thawing process is relatively low." *Wilder, supra.* Thus, "cryopreservation of eggs is relatively seldom employed." *Id.*

Trial Court Opinion, 5/6/2011, at 1–3 (citations omitted; footnotes added).

After argument, the trial court concluded that while "ordinarily the party wishing to avoid procreation should prevail, in our balancing of the facts unique to this case, we find that Wife's inability to achieve biological parenthood without the use of the pre-embryos is an interest which outweighs Husband's desire to avoid procreation." Trial Court Opinion, 5/6/2011, at 9. Accordingly, the trial court entered a final decree and awarded the pre-embryos to Wife as part of the order of equitable distribution. Final Decree, 5/6/2011, at 3 (unnumbered). Husband filed a timely notice of appeal and both Husband and the trial court complied with Pa.R.A.P. 1925.

On appeal, Husband presents numerous issues for review. The primary focus for Husband is that the trial court erred in finding that Wife's interests in procreating outweighed Husband's interests to avoid unwanted procreation.

▮▮▮ We review an equitable distribution order for an abuse of discretion. *Biese v. Biese,* 979 A.2d 892, 895 (Pa.Super.2009).

A trial court has broad discretion when fashioning an award of equitable distribution. Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. This Court will not find an abuse of discretion unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record. In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. We measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights.

*Id.* (internal citations and quotations omitted).

First, we point out, and both parties agree, that the contested disposition of frozen pre-embryos in the event of divorce is an issue of first impression in Pennsylvania. Trial Court Opinion, 5/6/2011, at 4; Husband's Brief at 10; Wife's Brief at 13. The cryopreservation of pre-embryos presents novel legal issues, "primarily because of the potential for the passage of several years between fertilization and later transfer and subsequent birth of the child." *Wilder, supra.* In this case, Husband and Wife have separated and now disagree on whether the pre-embryos should be awarded to Wife for implantation or be awarded to Husband for either donation to research or destruction.

In determining who should receive these pre-embryos, we find guidance in the case law from our sister states that have addressed similar issues. These jurisdictions have conducted three types of analyses: the contractual approach, the contemporaneous mutual consent approach, and the balancing approach.

Some states first look to any prior agreements between the parties regarding the disposition of cryopreserved pre-embryos. *See Kass v. Kass,* 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998); *Roman v. Roman,* 193 S.W.3d 40 (Tex. App.2006); *In re Marriage of Dahl & Angle,* 222 Or.App. 572, 194 P.3d 834, 841 (2008). In all three cases, the husband and wife signed a consent form where they agreed that in the event of death or divorce, any cryopreserved pre-embryos

would be destroyed or donated to research. All three courts held that such an agreement was enforceable and did not violate public policy.

When considering a similar issue, the Supreme Court of Massachusetts came out differently. *See A.Z. v. B.Z.*, 431 Mass. 150, 725 N.E.2d 1051 (2000). In that case, the husband and wife utilized IVF and had twins. Prior to undergoing IVF, they filled in the portion of a consent form that provided that should the parties "separate," the wife would attain possession of any cryopreserved pre-embryos. The husband and wife subsequently separated and the wife wanted to use their cryopreserved pre-embryos for herself to have more children. Husband objected. The Supreme Court concluded that husband and wife never intended the agreement to be binding as an agreement between the two of them, the term "separation" is legally distinguishable from "divorce," and the consent form was ambiguous. *Id.* at 1056–57. Thus, the Court declined to enforce the agreement.

Furthermore, the Supreme Court of Massachusetts opined in *dictum* that "even had the husband and the wife entered into an unambiguous agreement between themselves regarding the disposition of the frozen pre-embryos, [they] would not enforce an agreement that would compel one donor to become a parent against his or her will." *Id.* at 1057. Enforcement of such a contract against the will of one party, the Supreme Court concluded, would violate public policy. *Id.* at 1058.

The Supreme Court of Iowa applied the contemporaneous mutual consent model. *See In re Marriage of Witten*, 672 N.W.2d 768 (Iowa 2003). In that case, the informed consent agreement allowed for the distribution of the pre-embryos only upon consent and agreement of both parties. At trial, wife wanted custody of the pre-embryos for implantation in herself or a surrogate. Husband wanted them to be donated to another couple. The Iowa court concluded that it violated public policy to enforce judicially an "agreement *between a couple* regarding their future family and reproductive choices." *Id.* at 782 (emphasis in original). The Court then held that the best approach in this case was to require the two parties to devise a new, contemporaneous agreement,[5] with the party opposing destruction responsible for storage fees. *Id.* at 783.

A third approach is for the court to balance the interests of the parties. The first state to do this was Tennessee. *See Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992). In that case, the husband and wife pursued fertility treatments for many years prior to the creation of the frozen pre-embryos at issue. Upon divorce, the parties disputed who controlled the pre-embryos. The wife wanted to donate them to another infertile individual for use and husband wanted to discard them.[6] The Supreme Court of Tennessee determined that a proper analysis required it to "weigh the interests of each party to the dispute . . . in order to resolve that dispute in a fair and responsible manner." *Id.* at 591. The husband testified that he was "vehemently opposed to fathering a child that would not live with both parents" due to his own parents' history of divorce. *Id.* at 604. He was also opposed to donating the pre-embryos to another couple whose marriage might end in divorce.

On the other hand, wife wanted to donate them to another couple because otherwise she would have the "burden of

**5.** This approach strikes us as being totally unrealistic. If the parties could reach an agreement, they would not be in court.

**6.** Initially, wife wanted to use the pre-embryos for herself, but during the course of litigation, she remarried and no longer wished to use them for herself.

knowing that the lengthy IVF procedures she underwent were futile." *Id.* The Supreme Court of Tennessee used a balancing approach and concluded that husband's interest outweighed wife's in this case, and further noted that "[t]he case would be closer if [wife] were seeking to use the pre-embryos herself, but only if she could not achieve parenthood by any other reasonable means." *Id.*

When confronted with a similar issue, New Jersey also applied a balancing approach. In *J.B. v. M.B.,* 170 N.J. 9, 783 A.2d 707 (2001), the wife utilized IVF and had given birth during the course of the marriage. When the parties separated, the husband wanted control over the frozen pre-embryos for use by a surrogate. The wife wanted the pre-embryos to be discarded. The Supreme Court concluded that, in this instance, wife's right not to procreate or be forced into parenthood outweighed husband's right to procreate where husband could still procreate without wife's involvement (the fertility issues which led to the couple's use of IVF in the first place were due to issues associated with the wife). *Id.* at 717. Notably, one justice wrote a concurring opinion stating that "the same principles that compel the outcome in this case would permit an infertile party to assert his or her right to use a pre[-]embryo against the objections of the other party, if such use were the only means of procreation." *Id.* at 720 (Verniero, J. concurring).

■ In this case, we need not decide whether to adopt one approach or another. Both the master and the trial court applied the balancing approach because neither party had signed the portion of the consent form related to the disposition of the pre-embryos in the event of divorce or death of one party. Also, it was quite obvious that Husband and Wife could not come to a contemporaneous mutual agreement regarding the pre-em-

bryos. Accordingly, we agree that the balancing approach is the most suitable test. Nonetheless, Husband argues that the trial court should have enforced a provision in the consent form that the pre-embryos would be destroyed after three years. Husband's Brief at 10. We disagree.

Prior to undergoing IVF, Husband and Wife signed a form entitled Informed Consent for Cryopreservation and Storage of Embryos. Wife signed as the Patient and Husband signed as the Partner. The form provided that the "[m]aximum duration of embryos storage for each group or partial group of embryos is not to exceed three years." Informed Consent, p. 2.

The section of the informed consent regarding the duration of storage cannot be read as an agreement between Husband and Wife to destroy the pre-embryos at the end of three years; rather, it is an agreement between the two of them and RSI about the storage of the pre-embryos. Furthermore, the contract also provided that RSI would send a notice of intent to destroy the pre-embryos via certified mail when it came time to destroy them. Both Husband and Wife testified that they had not received such notice. N.T., 2/22/2010, at 44, 59. Accordingly, Husband had no reasonable expectation that the pre-embryos would be destroyed. Because the parties never agreed to a disposition for the pre-embryos in the event of death or divorce, Husband's contention that the trial court erred by not applying the three-year destruction provision is without merit.

We must now determine whether the trial court erred in its application of the balancing approach. To that end, we are left with the same questions the Supreme Court of Tennessee faced in *Davis, supra,* where "there was initially no agreement between the parties concerning disposition of the pre[-]embryos under the circumstances of this case; there has been no

agreement since; and there is no formula in the Court of Appeals opinion for determining the outcome if the parties cannot reach an agreement in the future." *Davis,* 842 S.W.2d at 598.

 We first note that "[i]n the context of an equitable distribution of marital property, a trial court has the authority to divide the award as the equities presented in the particular case may require." *Schenk v. Schenk,* 880 A.2d 633, 639 (Pa.Super.2005).[7] Here, the trial court held that "because Wife cannot achieve genetic parenthood otherwise, we conclude that Wife's interest in biological procreation through the use of these pre-embryos outweighs Husband's professed interest against procreation." Trial Court Opinion, 5/6/2011, at 9. We agree.

### Wife's Interests in Procreation

This case presents a compelling circumstance not at issue in cases resolved by our sister states—the trial court concluded that Wife has no ability to procreate biologically without the use of the disputed pre-embryos. Trial Court Opinion, 5/6/2011, at 10. Husband disagrees with a number of aspects of this conclusion. He argues the evidence was insufficient to support this finding. Husband's Brief at 9, 15. He also argues that Wife should have produced medical evidence or a medical expert to verify this contention. *Id.* at 10, 15. Husband also argues that the "trial court erred and abused its discretion in making credibility determinations on [Wife's] exceptions to the Master's recommendation." *Id.* at 16. Husband's arguments do not entitle him to relief.

At the Master's hearing, Wife testified that she does not "think it is possible" for her to have a biological child. N.T., 2/22/2010, at 56. Upon questioning by the Master about any results of medical testing, Wife stated, "I was [led] to believe that I cannot have children myself as I am." *Id.* at 74. Furthermore, Wife testified that she underwent IVF only after she was diagnosed with breast cancer, after consultation with her doctor, and then she delayed chemotherapy by two to three weeks to undergo the process. *Id.* at 53, 57.

The Master offered the following conclusions based on Wife's testimony at the hearing:

> It is recognized that opportunities of conceiving decrease after age forty. And this Master is aware of the potential ramifications of her cancer treatments. That being said, Wife did not offer any medical testimony as to her inability nor did she testify to any testing [8] that would lead her to conclude a natural pregnancy is medically unlike-

**7.** Neither Husband nor Wife raises any issue related to the fact that the master and trial court treated the pre-embryos as marital property. Accordingly, we will not disturb that finding.

**8.** This statement by the Master is unsupported by the record. At the hearing, when Wife tried to testify about her medical testing, Husband objected and the Master sustained the objection.

> [Counsel for Wife]: Do you know what impact of all that radiation and chemotherapy had on your body?
> [Wife]: To some extent. It took me awhile to get back to feeling healthy and not be tired. Those were my own physical obli-

gations and limitations. But afterwards I did have some testing done and they did say that—

> [Counsel for Husband]: Objection. She can't testify to medical—
> Master Snyder: Sustained.
> [Counsel for Wife]: What kind of testing?
> [Wife]: Bodily functions, just a measurement chart to see where my body, what levels are up and down, I guess, through various specialists.

N.T., 2/22/2010, at 54.

Master Snyder also inquired into this area:

> Master Snyder: Have you had any kind of testing done since your recovery that would lead you to believe that you are incapable of having children?

ly.... While conceiving naturally may be extremely difficult, both adoption and foster children are found to be reasonable means of achieving parenthood ...

Amended Report of the Master, 8/11/2010, at 18.

The trial court offered the following analysis:

Wife provided sufficient testimony that these thirteen pre-embryos were her only viable option to achieve genetic parenthood. Wife testified that she had Stage 3B cancer requiring a biopsy, two surgeries, eight rounds of chemotherapy and 37 rounds of radiation. After receiving her cancer diagnosis and upon suggestion of her doctor, she and Husband went through the IVF process in order to preserve Wife's ability to conceive a child. Upon questioning by the Master as to whether she had medical tests done which lead her to believe that she was incapable of having children, Wife testified that she had tests done after her recovery and that she could not have children.

Trial Court Opinion, 8/15/2011, at 2.

 Both the Master and trial court essentially concluded that Wife's doctors informed her that it would be highly unlikely, if not impossible, for her to become pregnant after undergoing chemotherapy treatments. After all, it is well known that "[l]ife-preserving treatments such as chemotherapy and radiation threaten fertility[.]" Gregory Dolin, M.D., J.D. et. al., *Medical Hope, Legal Pitfalls: Potential Legal Issues in the Emerging Field of Oncofertility*, 49 Santa Clara L.Rev. 673,

683 (2009). Furthermore, Wife's age is a factor. Accordingly, Wife's testimony was sufficient to support the conclusion; the trial court did not make a credibility determination; and additional medical evidence or testimony was unnecessary in this case.

Husband also argues the trial court erred in concluding that Wife had no other reasonable opportunities to become a parent. Husband's Brief at 17–19. Specifically, Husband contends that both adoption and foster parenting were available to Wife. *Id.*

First, we point out, that our consideration is in Wife's interest to procreate as opposed to achieving any sort of parenthood. Furthermore, with regard to having a biological versus a non-biological child, Wife testified that she "always believed that [she] would have children." N.T., 2/22/2010, at 56. She stated, "I always wanted to have children. I wouldn't have gone through ... the whole IVF thing if I hadn't wanted children.... And I wanted that experience of being pregnant and that closeness, that bond." *Id.*

There is no question that the ability to have a biological child and/or be pregnant is a distinct experience from adoption. Thus, simply because adoption or foster parenting may be available to Wife, it does not mean that such options should be given equal weight in a balancing test. Adoption is a laudable, wonderful, and fulfilling experience for those wishing to experience parenthood, but there is no question that it occupies a different place for a woman than the opportunity to be pregnant and/or have a biological child. As a matter of

---

[Counsel for Husband]: Your Honor, I would object because it is their burden to produce medical evidence. That hasn't been done in this case.
[Counsel for Wife]: She can testify as to whether she had tests done.
[Wife]: I have had tests done.

Master Snyder: Objection is overruled. And obviously, you can't give me any kind of medical opinion, but do you have reason to believe that [you] would or would not be successful?
[Wife]: I was [led] to believe that I cannot have children myself as I am.
*Id.* at 73–74.

science, traditional adoption does not provide a woman with the opportunity to be pregnant.

Even if adoption was not a distinct experience from the opportunity to procreate biologically, we agree with the trial court's conclusion that adoption is not a practical option for Wife. Trial Court Opinion, 5/6/2011, at 11–12. At the hearing, Wife testified to the following:

> I would probably have to go outside the country to adopt. And, additionally, because of my health history, a lot of birth parents or agencies in foreign countries would look down on that, despite the fact I have been given a clean bill of health.

N.T., 2/22/2010, at 55.

Adoption is a complicated process. "There are three routes by which one may adopt a child. None [is] risk or burden-free and the burdens are multiplied for aging single women." Ellen Waldman, *The Parent Trap: Uncovering the Myth of "Coerced Parenthood" in Frozen Embryo Disputes,* 53 Am. U.L.Rev. 1021, 1056 (2004). Waldman then goes on to discuss the public, private, and international routes for adoption, all of which pose significant obstacles to Wife. She notes that in terms of public adoption, there are many more adoptive parents than children available for adoption.[9] Furthermore, when public adoption agencies do have a "child, they first look to place that child with a married couple and will only look to a single person as a secondary option." *Id.* at 1057. Additionally, there are issues for older, single women when it comes to private adoption. She notes that "all private agencies have their own requirements regarding age, marital status and income that may exclude older single mothers." *Id.* at 1058. The same holds true for foreign adoption, which leads Waldman to conclude that "[a]doption, especially for single older women, is an expensive process fraught with the potential for protracted delay and ultimate disappointment." *Id.* at 1059.[10]

---

9. This finding could depend upon a parent's desired characteristics in a child. For example, "[a]lthough the supply of nondevelopmentally delayed newborns available for adoption in the United States is low, the number of older children and special needs children waiting for adoption is quite high." I. Glenn Cohen, *The Right Not to Be A Genetic Parent?,* 81 S. Cal. L.Rev. 1115, 1189 (2008).

10. Husband criticizes the trial court's reliance on this particular law review article because it is a secondary source, was not part of the record, and was not entered into evidence. Husband's Brief at 19. Such contentions are without merit. Although Husband criticizes the trial court's reliance, he does not provide any other relevant information to show that either the trial court was incorrect in its reliance or that the article itself was incorrect.

Furthermore, other law review articles confirm the findings cited in the law review article at issue. *See also* Sara C. Mills, *Perpetuating Ageism Via Adoption Standards and Practices,* 26 Wis. J.L. Gender & Soc'y 69, 70 (2011) ("[M]any adoption agencies set age limits for applicants and some courts have denied placement due to an adoptive parent's age."); Jehnna Irene Hanan, *The Best Interest of the Child: Eliminating Discrimination in the Screening of Adoptive Parents,* 27 Golden Gate U.L.Rev. 167, 168 (1997) ("Until recently, states not only allowed but required agencies to screen out parents who were not the same race as the children they wished to adopt. Most states still allow similar discrimination on the basis of the age or marital status of potential adoptive parents.").

Finally, in landmark cases and cases of first impression, it is common for courts to look to outside sources to formulate an opinion. For example, in *Brown v. Bd. of Ed. of Topeka, Shawnee County, Kan.,* 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court of the United States looked to "modern authority" regarding the psychological effect of prejudice and racial discrimination. *Id.* at fn. 11.

We, too, reviewed these articles and alternate authorities and conclude, in light of Wife's testimony, that they accurately depict

Thus, we conclude that Wife's compelling interests in using the pre-embryos include the fact that these pre-embryos are the option that provides her with what is likely her only chance at genetic parenthood and her most reasonable chance for parenthood at all. We now turn to consider Husband's interests in avoiding unwanted procreation.

### Husband's Interests to Avoid Unwanted Procreation

Husband makes several arguments that the trial court erred in the weight it applied to his reasons for avoiding unwanted procreation with the pre-embryos. Husband contends that he opposes Wife's use of these pre-embryos for procreation because he, himself, was adopted and he would not want any of his children not to know his or her biological father. Husband's Brief at 29–30.

Husband's concerns, based on his own life experiences, are not unreasonable. However, we agree with the trial court that these concerns are ameliorated by the fact that "Wife has agreed to permit Husband to be involved in the child's life, if he so desires." Trial Court Opinion, 5/6/2011, at 11. Wife's testimony at the master's hearing supports this conclusion.

Q: And [Husband] also testified if you had a child, he would want to participate, if there was a child, he would want to participate in raising it. How do you feel about that?

A: That's fine. I would want him, his parents to be involved as well. Because I feel that would be good for the child.

Q: You haven't had a lot of communication since you've separated?

A: I know, but I haven't seen any reason.

Q: But you don't have a child with him yet?

Wife's prospects for adoption. Accordingly,

A: Correct.

Q: Even if he was not financially responsible or not paying you support, would you have any objection to him seeing the child?

A: No.

N.T., 2/22/2010, at 59. Thus, Husband will have the option to be part of the child's life, alleviating his concerns about the child not being able to find out about his or her biological father.

Furthermore, Husband argues that he only agreed to participate in IVF as a "safeguard," and he never intended actually to have a child with Wife. Husband's Brief at 22–23. The trial court offered the following analysis about the weight it gave this argument.

We believe that Husband implicitly agreed to procreate with Wife when he agreed to undergo IVF, signed the consent form, provided sperm for the creation of the pre-embryos, and agreed to the fertilization causing the pre-embryos to be created. The use of the pre-embryos was never made contingent upon the parties remaining married. In fact, when provided the opportunity to resolve the fate of the pre-embryos in the event of divorce, neither party completed that portion of the IVF consent form.

Trial Court Opinion, 5/6/2011, at 10. Husband voluntarily provided Wife sperm when her doctors suggested she undergo IVF to preserve her fertility. To the extent Husband only considered his participation in IVF a "safeguard" for Wife, the only reason one undergoes IVF is to have a child. Clearly, Husband knew the potential result of his participation in IVF was going to be a child at some point in the future. The safeguard was to guard against the very situation where Wife

Husband is not entitled to relief.

could not have a biological child. That is the situation she is in now.

Husband also contends that the prospective child would be a financial burden for him, and the trial court erred in concluding it had full equity power to rely on Wife's vow not to seek financial support from Husband if a child is born. Husband's Brief at 26–27. Husband's concerns must be considered in light of Wife's agreement to do her best to assure that Husband never has to pay to support the child or children.

The trial court questioned counsel for Wife extensively on this issue at argument.

[Counsel for Wife]: [Husband] is afraid of the financial repercussions, but we put it right on the record, we put over and over again that we will do whatever it takes to make sure that there will be no financial repercussions. We agree to an indefinite alimony award of a dollar a year modifiable in the event my client ever filed for child support and we specified that amount will be 30 percent higher than any child support award agreed to. I don't believe that's against public policy. I believe it would stand.

THE COURT: What if she passed away?

[Counsel for Wife]: Your Honor, [Husband] would not be obligated to take care of this child if she passed away. He would have the right to have custody.

THE COURT: How about enforcing the dollar a year modifiable alimony if she passed away?

[Counsel for Wife]: She has family and friends that could raise this child. I acknowledge that that may not be ideal, especially for [Husband], who may feel an obligation to raise his own child, not have that child raised by a third party. But she could make a life insurance award so that there was money in trust that could be payable to [Husband] as reimbursement for any child support he had to pay for a third party.

THE COURT: Is she willing to do that?

[Counsel for Wife]: Yes, absolutely, she will do whatever financially it takes to make sure that [Husband] is whole and she can—she has retirement accounts. Your Honor knows the assets from the rest of this case and she would put all of that aside in escrow in the event of her death, along with any life insurance she may have, to make [Husband] whole if any third party filed for child support.

N.T., 11/10/2010, at 10–11.

Rather than making a determination about issues surrounding child support, the trial court concluded that "any attempt to decide these issues now would be speculative." Trial Court Opinion, 5/6/2011, at 12. The trial court went on to say that in its "overall balancing of the parties' interests, we have considered all the evidence presented, including Wife's 'vow' not to seek Husband's financial support for a child, but no reliance is placed on such a vow." Trial Court Opinion, 8/15/2011, at 7.

We recognize that "[i]n Pennsylvania, a parent cannot bind a child or bargain away that child's right to support." *Kesler v. Weniger*, 744 A.2d 794, 796 (Pa.Super.2000). Nonetheless, we have also held that "under *Roberts* [*v. Furst*, 385 Pa.Super. 530, 561 A.2d 802 (1989)], parties can make an agreement as to child support if it is fair and reasonable, made without fraud or coercion, and does not prejudice the welfare of the children." *Kraisinger v. Kraisinger*, 928 A.2d 333, 340 (Pa.Super.2007). Accordingly, we conclude the trial court did not err in the weight it gave to Wife's vow not to seek support-the trial court did not rely on the vow and appropriately left open such a

determination until the issue becomes an actual case or controversy before the court.

Finally, Husband makes an overarching argument that it is against Pennsylvania public policy to force him to procreate with Wife when he does not want to do so. Husband's Brief at 27–29. However, we agree with the trial court that Pennsylvania public policy is silent on the issue of forced procreation under these circumstances. There is no Pennsylvania case law at this time to guide us in these circumstances.

This situation, in some states, has moved from the state courts to the state legislatures.[11] However, unless and until our legislature decides to tackle this issue, our courts must consider the individual circumstances of each case. In this case, because Husband and Wife never made an agreement prior to undergoing IVF, and these pre-embryos are likely Wife's only opportunity to achieve biological parenthood and her best chance to achieve parenthood at all, we agree with the trial court that the balancing of the interests tips in Wife's favor.

Thus, we affirm the order of the trial court awarding the pre-embryos to Wife.

Order affirmed. Jurisdiction relinquished.

11. See Fla. Stat. Ann. § 742.17(2) (West 2012) ("Absent a written agreement, decision making authority regarding the disposition of pre[-]embryos shall reside jointly with the commissioning couple."); Tex. Fam.Code Ann. § 160.706(b) (Vernon 2011) ("The consent of a former spouse to assisted reproduction may be withdrawn by that individual in a record kept by a licensed physician at any time before the placement of eggs, sperm, or embryos.").