*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-0806

Dawn Pieper,
Appellant,

vs.

Jacob Thomas Carlson,
Respondent.

**Filed January 29, 2024**
**Affirmed**
**Frisch, Judge**

Hennepin County District Court
File No. 27-CV-22-2

Courtney Sebo Savica, Sebo Savica Law Firm, PLLC, Rochester, Minnesota (for appellant)

Denis E. Grande, Zachary P. Armstrong, DeWitt LLP, Minneapolis, Minnesota (for respondent)

Considered and decided by Frisch, Presiding Judge; Johnson, Judge; and Larkin, Judge.

## NONPRECEDENTIAL OPINION

**FRISCH**, Judge

On appeal from a judgment denying appellant's request for relief in a declaratory judgment proceeding, appellant argues that the district court abused its discretion in determining that her right to use a cryopreserved pre-embryo to produce a biological child did not supersede respondent's right not to use the pre-embryo. Because the district court

did not abuse its discretion in balancing the parties' respective interests in the pre-embryo, we affirm.

## FACTS

In 2015, appellant Dawn Pieper and respondent Jacob Thomas Carlson began a romantic relationship. During their relationship, the parties discussed having children and using in vitro fertilization (IVF) to conceive a biological child.[1] In December 2018, Pieper discovered she was pregnant. Pieper was 42 years old when she gave birth to F.C., who was conceived with Carlson through unassisted means.

In July 2020, the parties separated and Carlson moved out of the home he shared with Pieper. Pieper and Carlson experienced significant conflict in co-parenting F.C. Pieper restricted Carlson's parenting time with F.C. and generally did not allow unsupervised visitation. Despite challenges in their relationship, Pieper and Carlson continued discussions about having another biological child through IVF. Carlson believed that Pieper used parenting time with F.C. "like a carrot" to pressure him into IVF. Carlson

---

[1] "IVF refers to the combination of male and female gametes to produce a zygote, or fertilized egg, outside the body, which can be transferred into the uterus or Fallopian tubes of a woman, not necessarily the ovum provider, and gestated to term." *Reber v. Reiss*, 42 A.3d 1131, 1132 n.2 (Pa. Super. Ct. 2012) (quotation omitted), *rev. denied* (Pa. Dec. 27, 2012). The IVF procedure for Pieper included the following stages: (1) ovulation induction, (2) egg retrieval, (3) fertilization, (4) cryopreservation, and (5) frozen pre-embryo transfer. We use the term "pre-embryo" to refer to eggs that have been fertilized but not yet implanted during this process. "Pre-embryo is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. . . . The term frozen embryos is a term of art denoting cryogenically preserved pre-embryos." *McQueen v. Gadberry*, 507 S.W.3d 127, 134 n.4 (Mo. Ct. App. 2016) (quotation omitted).

expressed concerns to Pieper about having another child through IVF because of their on-going parenting issues.

In March 2021, Pieper began an ovulation-induction stage of IVF. After beginning this stage, Pieper inquired about using donor sperm, but the fertility clinic informed her that there was not enough time before the next stage of the process to use donor sperm. Pieper also asked about freezing her eggs unfertilized, but the fertility clinic informed her that unfertilized eggs would not survive the thawing process because of Pieper's age. Pieper informed Carlson that fertilizing her eggs with Carlson's sperm was her only option to use the retrieved eggs. Carlson responded that the couple was "not in a place to have a baby."

On April 4, 2021, Carlson provided his sperm to the fertility clinic and drove Pieper to the same clinic later that day for the egg-retrieval procedure. Carlson testified that he agreed to the fertilization stage because Pieper "assured [him] that there was no way for her to have these unless [he] agreed and these were only to be used for insurance purposes and just ensure [their] fertility." This stage of the IVF process resulted in two viable pre-embryos which were cryopreserved.

Pieper and Carlson continued to experience strain in their co-parenting relationship. Pieper refused to provide equal parenting time. At one point, Pieper told Carlson to "[g]et a lawyer." In July 2021, Pieper refused to allow Carlson any parenting time with F.C. The parties began custody litigation.

In December 2021, Pieper filed a complaint in district court seeking a declaratory judgment entitling her to "use the preserved [pre-]embryos to produce a biological child."

3

During a court trial, the district court received exhibits including text messages between the parties, consent and agreement forms for the IVF process, and an expert report from Dr. April Batcheller, Pieper's reproductive endocrinologist.

The informed-consent form signed by both parties provides: "If I/we elect to use frozen [pre-]embryos . . . we understand that each subsequent cycle will require the completion of the 'Frozen Embryo Transfer Consent, Authorization, and Release' by both the patient and partner (if applicable) to thaw and transfer frozen [pre-]embryos." The declaration of intent provides:

> In the event patient and partner are divorced, dissolve their relationship, or mutually agree to discontinue IVF treatments as a couple, I/we agree that the [pre-]embryos should be disposed of in the following manner . . . :
>
> A court decree, settlement agreement, or written instructions signed by each party and notarized will be presented to Practice and Lab directing use to achieve pregnancy in one of us or anonymously donate the [pre-]embryos to another couple . . . .

The declaration of intent also provides that the fertility clinic "will only maintain cryopreserved [pre-]embryos for a period of five (5) years," and Pieper and Carlson elected to "[d]estroy the frozen [pre-]embryos" after that time.

The district court received testimony from both parties and Dr. Batcheller. Dr. Batcheller testified to her conclusions that Pieper was not a suitable candidate for additional IVF procedures or other fertility treatments and opined that the disputed pre-embryos are Pieper's only means of producing a biological child. Dr. Batcheller also

4

testified that unassisted reproduction was not impossible for Pieper and that Pieper was not considered infertile.

The district court denied Pieper's request for declaratory relief.[2]  Pieper appeals.

**DECISION**

Pieper argues that the district court abused its discretion in declining to award her control over the cryopreserved pre-embryos.  She argues that her right to use the pre-embryos to produce a biological child supersedes Carlson's right to not produce a biological child and seeks reversal of the district court's determination balancing the parties' respective interests in favor of Carlson.

Minnesota courts have not adopted an approach for determining disposition of disputed pre-embryos.  *See Rucker v. Rucker*, No. A16-0942, 2016 WL 7439094, at *2, *9-11 (Minn. App. Dec. 27, 2016) (reversing and remanding a district court award of cryopreserved pre-embryos on contract-interpretation grounds but without discussing the propriety of a contract or other approach to deciding disposition of pre-embryos).[3]  Courts in other jurisdictions have applied three approaches when addressing disputes regarding the disposition of pre-embryos:  (1) a contract approach, which generally honors a preexisting agreement regarding disposition; (2) a contemporaneous-mutual-consent approach, which generally requires the written consent of both parties regarding

---

[2]  We note that the district court made no other decisions regarding the disposition of the pre-embryos, which we understand remain cryopreserved subject to the parties' agreement with the fertility clinic.

[3]  We cite nonprecedential opinions for their persuasive authority.  Minn. R. Civ. App. P. 136.01, subd. 1(c).

disposition; and (3) a balancing-of-interests approach, which involves the consideration of several factors to determine disposition.[4] *Rooks v. Rooks*, 429 P.3d 579, 587 (Colo. 2018). The parties agree that neither the contract nor the contemporaneous-mutual-consent approach would resolve the parties' dispute given the circumstances presented by this case and that the balancing-of-interests approach, which the district court applied here, is appropriate. We emphasize that the parties do not argue that the district court misapplied the law by applying the incorrect framework to resolve the parties' dispute. We do not resolve the question of the proper legal framework because the parties did not raise this issue on appeal.

Several courts have applied the balancing-of-interests approach to decide the disposition of pre-embryos. *See, e.g.*, *Reber*, 42 A.3d at 1137 (balancing an interest in having a biological child against an interest in avoiding unwanted procreation); *Szafranski v. Dunston*, 34 N.E.3d 1132, 1161 (Ill. App. Ct. 2015) (same), *rev. denied* (Ill. Sept. 30, 2015); *Rooks*, 429 P.3d at 593-95 (same). This approach was first used by the Supreme Court of Tennessee in *Davis v. Davis*, which considered the "equal significance" of the parties' rights to procreate and avoid procreation and resolved the dispute based on the

---

[4] *See Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) (applying a contract approach and reasoning that agreements between progenitors regarding the disposition of their pre-embryos "should generally be presumed valid and binding"); *Roman v. Roman*, 193 S.W.3d 40, 49-50 (Tex. App. 2006) (holding that an agreement between husband and wife, formed ahead of cryopreservation and implantation, providing for cryopreserved pre-embryo disposition in the event of divorce, death, or other changed circumstances would not violate Texas public policy); *Witten v. Witten*, 672 N.W.2d 768, 783 (Iowa 2003) (applying a contemporaneous-mutual-consent approach); *McQueen*, 507 S.W.3d at 157 (affirming the district court's application of a contemporaneous-mutual-consent approach).

6

"positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions." 842 S.W.2d 588, 601, 603 (Tenn. 1992), *reh'g granted*, No. 34, 1992 WL 341632 (Tenn. Nov. 23, 1992) (ordering that the fertility clinic may not donate the surplus pre-embryos to a childless couple for procreational purposes and remanding to the trial court for further proceedings). The Colorado Supreme Court expanded upon the *Davis* balancing approach in *Rooks*, identifying six non-exclusive factors in balancing the parties' respective interests:

> (1) the intended use of the pre-embryos by the spouse who wants to preserve them (for example, whether the spouse wants to use the pre-embryos to become a genetic parent him- or herself, or instead wants to donate them); (2) the demonstrated physical ability (or inability) of the spouse seeking to implant the pre-embryos to have biological children through other means; (3) the parties' original reasons for undertaking IVF (for example, whether the couple sought to preserve a spouse's future ability to bear children in the face of fertility-implicating medical treatment); (4) the hardship for the spouse seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations; (5) a spouse's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings; and (6) other considerations relevant to the parties' specific situation.

429 P.3d at 581, 593-94. *Rooks* also noted that a party's financial ability to support another child, existing biological children (standing alone), and the possibility of adoption or ability to parent non-biological children are not appropriate considerations in balancing the respective interests of the parties when the relevant interest at stake is achieving or avoiding "*genetic* parenthood." *Id*. at 594. The district court determined that the factors set forth in *Rooks* provided a useful framework to evaluate the parties' respective interests here and concluded, after balancing those factors, that Pieper's requested relief should be denied.

7

We review the district court's balancing of factors for an abuse of discretion. *See Thornton v. Bosquez*, 933 N.W.2d 781, 794 (Minn. 2019) (stating, that "[b]ecause [the appellant's challenges in that appeal] turn on a balancing of the best interests of the child, we review the district court's determination for an abuse of discretion"); *Webster v. Hennepin County*, 891 N.W.2d 290, 293 (Minn. 2017) (stating that when a district court addresses the discretionary question of whether to grant a stay pending appeal, what the district court "should do" is "identify the relevant factors, weight each factor, and then balance them, applying the court's sound discretion"); *Krmpotich v. City of Duluth*, 483 N.W.2d 55, 57 (Minn. 1992) (reasoning that where a district court "weighs the equities in a balancing test," under the Minnesota Environmental Rights Act, Minn. Stat. §§ 116B.01-.13 (1988), "the appropriate standard of review is the abuse of discretion standard"). In so doing, "we correct erroneous applications of law, but accord the district court discretion in its ultimate conclusions." *Porch v. Gen. Motors Acceptance Corp.*, 642 N.W.2d 473, 477 (Minn. App. 2002) (quotation omitted), *rev. denied* (Minn. June 26, 2002). "A district court abuses its discretion by making findings of fact that are unsupported by the evidence, misapplying the law, or delivering a decision that is against logic and the facts on record." *Bender v. Bernhard*, 971 N.W.2d 257, 262 (Minn. 2022) (quotation omitted). Pieper argues that the district court abused its discretion in its balancing of each factor, which we understand to be an argument that the district court's decision is contrary to logic and the facts on record.[5] We discuss the district court's consideration of each factor in turn.

---

[5] Pieper also argues the district court erred in "failing to consider" her promissory-estoppel theory. But Pieper represented to the district court that her claim is "not a promissory

### *Pieper's Intended Use of Pre-Embryos*

The district court first examined "the intended use of the party seeking to preserve the disputed pre-embryos." *Rooks*, 429 P.3d at 593 (reasoning that a party who wished to use a pre-embryo to become a genetic parent would have a weightier interest than one who sought to donate the pre-embryo); *see also Davis*, 842 S.W.2d at 603-04 (concluding that a party's interest in avoiding becoming a genetic parent outweighed the other party's interest in donating the pre-embryos); *J.B. v. M.B.*, 783 A.2d 707, 717 (N.J. 2001) (concluding that a party's interest in preventing further use of the pre-embryos outweighed the other party's interest in donating the pre-embryos).

The district court concluded that this factor "did not weigh heavily for either party." The district court recognized that Pieper's interest in the disputed pre-embryos was weightier than the interest of a party seeking to donate pre-embryos. The district court also recognized that Carlson held a compelling interest in not becoming a biological parent. Pieper argues that the district court abused its discretion because the evidence established that Carlson had at one time favored becoming a biological parent, and the district court therefore should have weighed this factor in her favor. We disagree. The record supports

---

estoppel claim" in her proposed order. In any event, Pieper's promissory-estoppel claim would fail because the record is devoid of evidence of a clear and definite promise necessary to a promissory-estoppel claim. *TMT Mgmt. Grp., LLC v. U.S. Bank Nat'l Ass'n*, 940 N.W.2d 239, 244 (Minn. App. 2020) ("Promissory estoppel is an equitable doctrine which requires proof of . . . 'a clear and definite promise' . . . ." (quoting *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000))). Pieper argues that Carlson, through his actions, clearly and definitely promised to complete the IVF process. But the record establishes that Carlson objected to the transfer of the pre-embryo, and his actions therefore are inconsistent with Pieper's characterization.

9

the district court's determination that Carlson ultimately opposed having a biological child with Pieper using the pre-embryo, and the district court's weighing of this factor was not an abuse of discretion.[6]

### *Pieper's Ability to Have Biological Children Through Other Means*

The district court next considered "the demonstrated physical ability (or, conversely, inability) of the party seeking to implant the disputed pre-embryos to have biological children through other means." *Rooks*, 429 P.3d at 593. The district court determined that the pre-embryos "are Ms. Pieper's best means of producing biological children, although not her only means" and weighed this factor "slightly" in Pieper's favor. Pieper argues that the district court abused its discretion by not assigning to her more weight for this factor because the district court improperly considered whether Pieper had other means of becoming a parent, through biological or other means.

We discern no abuse of discretion by the district court. The record contains evidence of the *possibility* that Pieper could produce biological children. We agree with Pieper that the evidence at trial also indicated that subsequent IVF procedures or other fertility treatments would not be successful. But Pieper's own expert testified that Pieper was not considered to be infertile and natural reproduction was possible, albeit very

---

[6] In her brief to this court, Pieper argued that the district court erred in concluding that Carlson's right not to procreate was "on equal footing" with her right to procreate. She asserted that Carlson opposed procreation only if "he received access to the child on his terms." We note that this assertion does not establish a hierarchy of the parties' respective rights regarding procreation or interests in the disputed pre-embryo. We are unaware of any authority in any jurisdiction establishing such a hierarchy of rights or interests, and we discern no error in the district court's assessment of the parties' respective interests.

unlikely. Thus, we cannot say that the district court abused its discretion. *Cf. Reber*, 42 A.3d at 1137 (considering that the trial court found that the wife had "no ability to procreate biologically without the use of the disputed pre-embryos").

We likewise cannot conclude that the district court abused its discretion by including observations that Pieper could achieve parenthood through other, non-biological, means. Although Pieper correctly observes that *Rooks* cautioned against such considerations in the balancing of pertinent factors, we do not read the district court's determination of this factor as dependent upon the possibility of alternate means of achieving parenthood. *Rooks*, 429 P.3d at 594. The district court concluded that this factor favored Pieper because of her interest in biological parenthood. We therefore discern no abuse of discretion by the district court in the consideration of this factor.[7]

### Parties' Original Reasons for IVF

The district court next considered "the parties' original reasons for pursuing IVF, which may favor preservation over disposition." *Rooks*, 429 P.3d at 593. For example, if parties have "turned to IVF to preserve a spouse's future ability to have biological children in the face of fertility-implicating medical treatment, such as chemotherapy" this factor may favor preservation over destruction of the pre-embryos. *Id.* at 593-94 (citing

---

[7] Because the district court reached its conclusion without regard to surrogacy, adoption, or becoming a foster parent, we express no opinion on the propriety of considering these options in addressing the disposition of disputed pre-embryos. We do note a lack of uniformity among jurisdictions in the consideration of alternate means of parenthood. *See Davis*, 842 S.W.2d at 604 (noting that a party "could still achieve the child-rearing aspects of parenthood through adoption"); *Reber*, 42 A.3d at 1138 (reasoning that adoption or foster parenting is a "distinct experience from adoption" and should not be given equal weight in a balancing test but not foreclosing consideration in other cases).

11

*Szafranski*, 34 N.E.3d at 1162); *see also Reber*, 42 A.3d at 1137 ("Wife testified that she underwent IVF only after she was diagnosed with breast cancer, after consultation with her doctor, and then she delayed chemotherapy by two to three weeks to undergo the process.").

The district court found that the "parties underwent IVF because Ms. Pieper's advancing age would soon compromise her fertility." The district court ultimately concluded that this factor favored Carlson because he only wished to parent another child with Pieper if "they were in a relationship and he was able to see his other child." The record supports the district court's conclusion that Carlson intended the pre-embryos to be used if the parties were in a relationship. Carlson testified that the embryos were "to be used for insurance purposes and just ensure our fertility" and "to ensure that we were viable to have a healthy baby." We therefore discern no abuse of discretion by the district court in its assessment of this factor.

### *Potential Hardship*

The district court next considered the "hardship for the person seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations." *Rooks*, 429 P.3d at 593-94. The district court found that this factor weighed in favor of Carlson, noting the record evidence showing that allowing Pieper to use the pre-embryo would negatively impact his emotional and psychological well-being, his potential liability for child support, and uncertainty regarding Carlson's parental rights for a child produced from the disputed pre-embryos. Pieper argues that the district court misapplied the law when it concluded that Carlson's parental rights or potential child-support obligations were

12

unclear and clearly erred in overlooking the hardship Pieper endured in the IVF process. We disagree.

Minnesota law provides a mechanism for Carlson to petition for parenting time and custody where paternity has been recognized. Minn. Stat. § 257.541, subd. 3 (2022). But the statute also provides that a "biological mother of a child born to a mother who was not married to the child's father when the child was born and was not married to the child's father when the child was conceived has *sole custody* of the child until paternity has been established." *Id.*, subd. 1 (2022) (emphasis added). If the pre-embryos were transferred, it appears that Carlson would not meet any of the statutory presumptions of paternity, and thus that recognition of Carlson's paternity would require Pieper to recognize Carlson's parentage. Minn. Stat. §§ 257.55, subd. 1 (setting forth presumptions of paternity); .75 (setting forth mechanisms to recognize parentage) (2022). Carlson's parentage rights for a child produced from the pre-embryos are not decided by statute and would require further litigation, burdening both parties.

Although Pieper faults the district court for failing to recognize the physical and emotional toll she experienced by undergoing the IVF process, these considerations are not typically recognized in the balancing of factors related to ultimate disposition. *Rooks* does not expressly instruct courts to look to the burden on the party who seeks to use the pre-embryos to procreate, but instead focuses this factor on the burdens experienced by the party opposed to such a use. 429 P.3d at 593-94. Accordingly, we cannot say that the district court abused its discretion in its analysis of this factor.

13

### *Bad Faith*

Finally, the district court considered "either spouse's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings." *Id*. at 594. In considering this factor, the district court noted the allegations of both parties: Pieper "alleged that Carlson used the pre-embryos as unfair leverage for his desired parenting time arrangement" and Carlson alleged that Pieper pressured him to continue in the IVF process. The district court found this factor weighed in favor of Carlson. Although the district court did not "attribute bad faith to either party," it found that "Ms. Pieper coerced Mr. Carlson into participating in the IVF process by threatening to end their relationship and withhold parenting time with F.C." This finding is supported by the record. The record shows, as the district court noted, that Pieper threatened to end the relationship between the parties, withheld parenting time from Carlson, and threatened to challenge Carlson's custody rights. Because the record supports the district court's assessment, we discern no abuse of discretion.

We recognize the deeply personal nature of the dispute between the parties, as did the district court. The parties, however, agreed to resolve this dispute through judicial process. And our review of the district court proceedings confirms that the district court did not abuse its discretion because it made factual findings supported by the record, applied the legal framework requested by Pieper, did not misapply the law, and balanced the parties' respective interests.

**Affirmed.**

14