# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Szafranski v. Dunston*, 2013 IL App (1st) 122975

---

| | |
|---|---|
| Appellate Court Caption | JACOB SZAFRANSKI, Plaintiff-Appellant, v. KARLA DUNSTON, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-12-2975 |
| Filed | June 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a case of first impression arising from a dispute over the disposition of cryopreserved pre-embryos created by sperm donated by plaintiff and ova donated by defendant, the trial court's entry of summary judgment for plaintiff based on the application of the balancing approach used by some state courts was vacated, and the appellate court remanded the cause for application of the contractual approach adopted by the majority of other courts to the previously adduced facts and additional facts the parties may want to present. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-29654; the Hon. Sophia H. Hall, Judge, presiding. |
| Judgment | Reversed and remanded with instructions. |

| Counsel on Appeal | Schroeder & McGuire, LLC, of Barrington (Brian A. Schroeder and Carolyn McGuire, of counsel), for appellant. |
| | |
| | K&L Gates, LLP, of Chicago (Abram I. Moore and Sara E. Fletcher, of counsel), for appellee. |

| Panel | JUSTICE QUINN delivered the judgment of the court, with opinion. Presiding Justice Harris and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1      This appeal is a case of first impression in Illinois involving a dispute between plaintiff-appellant, Jacob Szafranski, and defendant-appellee, Karla Dunston (collectively, the couple), over the right to use pre-embryos created with appellant's sperm and appellee's ova. The circuit court ultimately granted appellee's motion for summary judgment and denied appellant's cross-motion for summary judgment, granting appellee full custody and control over the pre-embryos. On appeal, appellant contends that the circuit court erroneously denied his motion for summary judgment where his rights of privacy and liberty under the United States and Illinois Constitutions require his consent to any use of the pre-embryos at the time of the proposed use; and that the circuit court erroneously granted appellee's motion for summary judgment where there are questions of fact regarding whether he agreed appellee could use the pre-embryos.

¶ 2                          I. BACKGROUND

¶ 3      The record shows, in relevant part, that in March 2010, appellee was diagnosed with non-Hodgkin's lymphoma and informed that her chemotherapy treatments would likely cause the loss of her fertility. She asked appellant, with whom she was in a relationship, if he would donate his sperm for the purpose of creating pre-embryos with her eggs, and he agreed to do so.

¶ 4      On March 25, 2010, the couple met with physicians and staff at Northwestern regarding the creation of the pre-embryos, and appellant deposited sperm to be frozen and used as a back-up on the date appellee's eggs were retrieved. The couple also signed a document entitled "INFORMED CONSENT FOR ASSISTED REPRODUCTION" (the informed consent). Besides outlining the risks involved with *in vitro* fertilization, the informed consent states that "[n]o use can be made of these embryos without the consent of both partners (if applicable). *** In the event of divorce or dissolution of the marriage or partnership, NMFF [Northwestern Medical Faculty Foundation's Division of Reproductive Endocrinology and Infertility] will abide by the terms of the court decree or settlement agreement regarding the

ownership and/or other rights to the embryos." The informed consent contains the following disclaimer as well:

> "The law regarding [*in vitro* fertilization], embryo cryopreservation, subsequent embryo thaw and use, and parent-child status of any resulting child(ren) is, or may be, unsettled in the state in which either the patient, spouse, partner, or any current or future donor lives, or in Illinois, the state in which the NMFF Program is located. NMFF does not provide legal advice, and you should not rely on NMFF to give you any legal advice. You should consider consulting with a lawyer who is experienced in the areas of reproductive law and embryo cryopreservation as well as the disposition of embryos, including any questions or concerns about the present or future status of your embryos, your individual or joint access to them, your individual or joint parental status as to any resulting child, or about any other aspect of this consent and agreement."

¶ 5 On the day of their meeting at Northwestern, the couple also met with an attorney, Nidhi Desai, to discuss the legal implications of creating pre-embryos, and Desai presented them with two possible arrangements: a co-parent agreement or a sperm donor agreement. On March 29, 2010, appellee sent Desai an e-mail opting for the former, and Desai sent the couple a draft of a co-parent agreement (the co-parent agreement). The stated primary purpose of the co-parent agreement was "to memorialize the Parties' intent and agreement that they shall both be established as the legal co-parents of the Child." The co-parent agreement provided, *inter alia*, that the couple would attempt to participate in at least one *in vitro* fertilization and pre-embryo transfer cycle in which appellant would "provide sperm samples to create the pre-embryos," and that appellant "**agrees to undertake all legal, custodial, and other obligations to the Child regardless of any change of circumstance between the Parties**." (Emphasis in original.) The co-parent agreement also provided that "[a]ny eggs retrieved and cryopreserved as a result of this [in vitro fertilization] retrieval shall be under Karla's sole control" and that "[s]hould the Intended Parents separate, Karla will control the disposition of the pre-embryos." Further, the co-parent agreement provided: "Jacob acknowledges and agrees that Karla is likely to be unable to create new healthy embryos subsequent to the chemotherapy regiment she will undergo, and Jacob specifically agrees that Karla should have the opportunity to use such embryos to have a child."

¶ 6 The co-parent agreement was never signed by the couple. Nevertheless, on April 6, 2010, appellant deposited sperm and eight eggs were retrieved from appellee. The couple agreed to fertilize all eight based on the doctor's advice that doing so would be appellee's best chance of having a child, and three of the pre-embryos ultimately survived to viability. The next day, appellee began her chemotherapy treatment.

¶ 7 In May 2010, appellant sent appellee a text message ending their relationship. On August 22, 2011, he filed a *pro se* complaint in the circuit court of Cook County seeking to permanently enjoin appellee from using the pre-embryos so as to "preserv[e] [his] right to not forcibly father a child against his will." On September 1, 2011, appellee responded with a three-count verified counterclaim: in count I, she sought a declaratory judgment granting her sole custody and control over the pre-embryos and the right to use them to bear children; in count II, she alleged breach of contract and requested specific performance of the parties' agreement; and in count III, she sought relief under a theory of promissory estoppel.

¶ 8 At the close of discovery, the parties filed cross-motions for summary judgment. Appellee asserted, *inter alia*, that appellant was bound by the terms of the co-parent agreement because, even though he did not sign it, he fully performed his one "critical" obligation under the agreement and provided sperm samples to create the embryos. She also asserted that appellant induced her to rely on his representation that he would help her have her own children, and that she was harmed by that reliance because now she cannot go back and use a random sperm donor to fertilize her eggs. Additionally, appellee asserted that if the court found that appellant was not bound by the co-parent agreement or estopped from preventing use of the embryos, the court should follow *Reber v. Reiss*, 42 A.3d 1131 (Pa. Super. Ct. 2012), and balance the interests of the parties, finding that her interest in having her own biological children outweighs appellant's interest in not fathering a child. Appellee attached to her motion a letter from Dr. Eve Feinberg stating that appellee has ovarian failure as a result of her chemotherapy treatment which has "rendered [her] unable to conceive a child with the use of her own oocytes."

¶ 9 Appellant claimed that he was entitled to summary judgment based on the right not to be a parent under the United States and Illinois Constitutions. In support of his federal constitutional claim, he cited abortion case law and asserted that "the right to an abortion is a semantic recasting of the constitutional right not to be a parent." He argued that unlike in the abortion context, though, a man and woman are in equal positions when it comes to cryopreserved embryos, because they are not inside the woman's body. Therefore, he argued, "the constitutional right not to be a parent means the consent of both the woman and the man is required for any use of the preembryos." As for the Illinois Constitution, appellant adopted the same argument and noted that "the Illinois right to privacy is broader than the federal right." He further asserted that *Reber* did not apply and that *In re Marriage of Witten*, 672 N.W.2d 768 (Iowa 2003), was "[m]ore in line with the federal and Illinois constitutional right not to be a parent." Lastly, appellant maintained that appellee's motion for summary judgment should be denied because there was a question of fact regarding whether a contract existed.

¶ 10 On September 17, 2012, the circuit court granted appellee's motion for summary judgment and denied appellant's motion for summary judgment. The court noted that the case was one of first impression in Illinois and that appellee's "legal theories include[d] contract, promissory estoppel, and then even beyond that the balancing of the interests of the parties, which is discussed in *Reber*." The court stated:

"The Court is not persuaded by the legal arguments made by [appellant] in his brief as applied to all of the facts in this case.

The Court is persuaded by the reasoning in the cases that [appellee] has cited in support of each of her legal theories for her opportunity to use the embryos to become a biological parent.

And accordingly, the Court adopts the legal reasoning that's contained in the cases that are relied on by [appellee] in her brief."

The following day, the court entered a written order of its ruling, and ordered that appellee "shall have full custody and control over the disputed preembryos that are presently in the

custody of Northwestern Hospital and may use them to attempt to have children." Pursuant to Illinois Supreme Court Rule 305 (eff. July 1, 2004), the court stayed enforcement of the order pending a disposition on appeal.

## II. ANALYSIS

Appellant now contends that the circuit court erroneously denied his motion for summary judgment, claiming that his rights of privacy and liberty under the United States and Illinois Constitutions require that he consent to any use of the pre-embryos. He also contends that the court erroneously granted appellee's motion for summary judgment where questions of fact exist regarding whether he agreed appellee could use the pre-embryos.

## A. Standard of Review

"Summary judgment is appropriate when 'the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Tunca v. Painter*, 2012 IL App (1st) 110930, ¶ 13 (quoting 735 ILCS 5/2-1005(c) (West 2010)). We review *de novo* the circuit court's ruling on a motion for summary judgment. *Tunca*, 2012 IL App (1st) 110930, ¶ 13.

## B. The Law of Cryopreserved Pre-Embryos

This case presents an issue of first impression in Illinois; namely, who controls the disposition of cryopreserved pre-embryos created with one party's sperm and another party's ova. Courts in other jurisdictions have addressed this issue under various circumstances and generally conducted three types of analyses in resolving this question: (1) a contractual approach; (2) a contemporaneous mutual consent approach; and/or (3) a balancing approach. *Reber*, 42 A.3d at 1134. Each of these approaches is discussed, in turn, below.

## 1. The Contractual Approach

The first approach applied by courts in these circumstances is the contractual approach. Under this approach, courts will enforce contracts governing the disposition of pre-embryos which were entered into at the time of *in vitro* fertilization so long as they do not violate public policy. *Witten*, 672 N.W.2d at 776. The benefits of a contractual approach are that it encourages parties to enter into agreements that will avoid future costly litigation, and that it removes state and court involvement in private family decisions. As noted by the Court of Appeals of New York:

"[P]arties should be encouraged in advance, before embarking on [*in vitro* fertilization] and cryopreservation, to think through possible contingencies and carefully specify their wishes in writing. Explicit agreements avoid costly litigation in business transactions. They are all the more necessary and desirable in personal matters of reproductive choice, where the intangible costs of any litigation are simply incalculable. Advance directives, subject to mutual change of mind that must be jointly expressed, both minimize

-5-

misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision. Written agreements also provide the certainty needed for effective operation of [*in vitro* fertilization] programs [citations].

\*\*\*

\*\*\* To the extent possible, it should be the progenitors– not the State and not the courts–who by their prior directive make this deeply personal life choice." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998).

¶ 19 Criticism of the contractual approach, on the other hand, includes that it " 'insufficiently protects the individual and societal interests at stake.' " *Witten*, 672 N.W.2d at 777 (quoting Carl H. Coleman, *Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes*, 84 Minn. L. Rev. 55, 88-89 (1999)). Among the concerns is that " 'decisions about the disposition of frozen embryos implicate rights central to individual identity,' " and that " '[o]n matters of such fundamental personal importance, individuals are entitled to make decisions consistent with their contemporaneous wishes, values, and beliefs.' " *Witten*, 672 N.W.2d at 777 (quoting Coleman, *supra*, at 88-89). Of further concern is that " 'requiring couples to make binding decisions about the future use of their frozen embryos ignores the difficulty of predicting one's future response to life-altering events such as parenthood,' " and that " 'treating couples' decisions about the future use of their frozen embryos as binding contracts undermines important values about families, reproduction, and the strength of genetic ties.' " *Witten*, 672 N.W.2d at 777 (quoting Coleman, *supra*, at 88-89).

¶ 20 Notwithstanding these criticisms, the contractual approach has been applied/endorsed in five states. See *Kass*, 696 N.E.2d at 180 (New York); *In re Marriage of Dahl*, 194 P.3d 834, 840-41 (Or. Ct. App. 2008) (Oregon); *Davis v. Davis*, 842 S.W.2d 588, 597 (Tenn. 1992) (Tennessee); *Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App. 2006) (Texas); *In re Marriage of Litowitz*, 48 P.3d 261, 268 (Wash. 2002), *amended by* 53 P.3d 516 (Wash. 2002) (Washington); see also *York v. Jones*, 717 F. Supp. 421, 425 (E.D. Va. 1989) (noting that cryopreservation agreement was a bailment contract between husband and wife and the medical institute); but see *A.Z. v. B.Z.*, 725 N.E.2d 1051, 1057 (Mass. 2000) (Massachusetts).

¶ 21 In *Kass*, a husband and wife underwent *in vitro* fertilization when the wife could not become pregnant due to prenatal exposure to diethylstilbestrol. *Kass*, 696 N.E.2d at 175. They signed a consent form stating that " '[o]ur frozen pre-zygotes will not be released from storage for any purpose without the written consent of *both* of us.' " (Emphasis in original.) *Kass*, 696 N.E.2d at 176. They also signed a consent form stating:

" 'In the event that we no longer wish to initiate a pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes and direct the IVF program to (choose one): \*\*\*

(b) Our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program.' " *Kass*, 696 N.E.2d at 176-77.

The wife subsequently commenced a matrimonial action and requested sole custody of the pre-zygotes in order to undergo another implantation procedure, and the husband opposed their removal and any further attempts by the wife to achieve pregnancy. *Kass*, 696 N.E.2d at 177. The Court of Appeals of New York held that "[a]greements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them." *Kass*, 696 N.E.2d at 180. The court then found that "the informed consents signed by the parties unequivocally manifest[ed] their mutual intention that in the present circumstances the pre-zygotes be donated for research to the IVF program." *Kass*, 696 N.E.2d at 181.

¶ 22     In *Davis*, a husband and wife underwent *in vitro* fertilization because the wife was without functional fallopian tubes by which she could conceive a child naturally. *Davis*, 842 S.W.2d at 591. They did not execute a written agreement specifying the disposition of unused pre-embryos, however, and they could not agree during their divorce proceedings on who would have custody of them. *Davis*, 842 S.W.2d at 589-90. The Supreme Court of Tennessee held:

> "We believe, as a starting point, that an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors. This conclusion is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition." *Davis*, 842 S.W.2d at 597.

Regardless of this holding, the court found that there was no agreement and turned to balancing the interests of the parties. *Davis*, 842 S.W.2d at 598, 603.

¶ 23     In *Marriage of Dahl*, a husband and wife underwent *in vitro* fertilization and signed an "Embryology Laboratory Specimen Storage Agreement," which stated:

> " 'In connection with requests for transfer of the Embryos or upon termination of this Agreement, UNIVERSITY is hereby irrevocably authorized and directed to transfer or dispose of the Embryos as follows:
>
> \*\*\*
>
> B. *If the CLIENTS are unable or unwilling to execute a joint authorization*, the CLIENTS hereby designate the following CLIENT or other representative to have the sole and exclusive right to authorize and direct UNIVERSITY to transfer or dispose of the Embryos, pursuant to the terms of this Agreement[.]' " (Emphasis in original.) *Marriage of Dahl*, 194 P.3d at 836.

The wife's name was printed directly below that paragraph in a space designated "Name," and the initials of her and husband were next to her name in spaces designated for the parties' approval. *Marriage of Dahl*, 194 P.3d at 836. The couple subsequently decided to dissolve their marriage and could not agree on the disposition of six frozen embryos that remained from the *in vitro* fertilization process. *Marriage of Dahl*, 194 P.3d at 836. The Court of Appeals of Oregon, after reviewing relevant case law, adopted a contractual approach to resolving the issue, noting:

"[T]he general framework set forth by the courts in *Davis* and *Kass*, in which courts give effect to the progenitors' intent by enforcing the progenitors' advance directive regarding the embryos, is persuasive. Moreover, giving effect to a valid agreement evincing the parties' intent regarding disposition of embryos is consistent with our statutory and case law that give similar effect to prenuptial agreements and agreements made during a marriage." *Marriage of Dahl*, 194 P.3d at 840.

Ultimately, the court found that the agreement executed by the couple evinced their intent that the wife would decide the disposition of the embryos. *Marriage of Dahl*, 194 P.3d at 841.

¶ 24    In *Roman*, a husband and wife underwent *in vitro* fertilization after "the traditional avenues of childbirth" and several attempts at artificial insemination proved unsuccessful. *Roman*, 193 S.W.3d at 42. They signed a document entitled "Informed Consent for Cryopreservation of Embryos" wherein they chose to discard the embryos in case of divorce. *Roman*, 193 S.W.3d at 42. Following a divorce trial, the trial court ordered that wife take possession of the three remaining embryos. *Roman*, 193 S.W.3d at 43. On appeal, the Court of Appeals of Texas found that agreements controlling embryo disposition were valid, stating:

"We believe that allowing the parties voluntarily to decide the disposition of frozen embryos in advance of cryopreservation, subject to mutual change of mind, jointly expressed, best serves the existing public policy of this State and the interests of the parties. We hold, therefore, that an embryo agreement that satisfies these criteria does not violate the public policy of the State of Texas." *Roman*, 193 S.W.3d at 50.

The court then held that "the embryo agreement provide[d] that the frozen embryos are to be discarded in the event of divorce," and that the trial court abused its discretion in not enforcing the agreement. *Roman*, 193 S.W.3d at 54.

¶ 25    In *Litowitz*, a husband and wife decided to have a child through *in vitro* fertilization and had five pre-embryos created with the husband's sperm and an egg donor's eggs. *Litowitz*, 48 P.3d at 262. Three of the pre-embryos were implanted in a surrogate mother and produced a child, and two were cryopreserved and stored in a clinic. *Litowitz*, 48 P.3d at 262-63. The husband and wife signed a "consent and authorization for preembryo cryopreservation contract" with the clinic which stated, "In the event we are unable to reach a mutual decision regarding the disposition of our pre-embryos, we must petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of our pre-embryos." *Litowitz*, 48 P.3d at 263. They also indicated in the contract that they wanted their pre-embryos to be thawed but not allowed to undergo further development in the event that their pre-embryos had been maintained in cryopreservation for five years. *Litowitz*, 48 P.3d at 264. The couple separated, and during the dissolution proceedings, the husband sought to put the remaining pre-embryos up for adoption while the wife sought to implant the remaining pre-embryos in a surrogate mother. *Litowitz*, 48 P.3d at 264. The trial court awarded the pre-embryos to the husband based upon the "best interest of the child." *Litowitz*, 48 P.3d at 264. On appeal, the Supreme Court of Washington found that because the wife did not produce the eggs used to create the pre-embryos and had no biological connection to them, any right

she had to the pre-embryos would have to be based solely upon contract. *Litowitz*, 48 P.3d at 267. The court further noted that because the couple had not reached a mutual decision regarding disposition of the pre-embryos, it was appropriate for the courts to determine their disposition under the cryopreservation contract. *Litowitz*, 48 P.3d at 268. The court ultimately reversed, holding that under the terms of the contract, "the remaining preembryos would have been thawed out and not allowed to undergo further development" because more than five years had passed. *Litowitz*, 48 P.3d at 271.

¶ 26     In *A.Z.*, on the other hand, the Supreme Judicial Court of Massachusetts declined to honor the parties' advance agreement regarding the disposition of pre-embryos on the grounds of public policy. There, a husband and wife underwent *in vitro* fertilization due to the wife's difficulties conceiving a child. *A.Z.*, 725 N.E.2d at 1052. They signed a consent form stating that if they " '[s]hould become separated, [they] both agree[d] to have the embryo(s) ... return[ed] to [the] wife for implant.' " *A.Z.*, 725 N.E.2d at 1054. At the time of their divorce, one vial containing four frozen pre-embryos remained in storage, and the husband filed a motion for a permanent injunction to prohibit the wife from using them. *A.Z.*, 725 N.E.2d at 1053. On appeal, the Supreme Judicial Court of Massachusetts initially expressed doubt that the consent form "represent[ed] the intent of the husband and the wife regarding disposition of the preembryos in the case of a dispute between them." *A.Z.*, 725 N.E.2d at 1056. The court noted, *inter alia*:

> "[T]he consent form's primary purpose is to explain to the donors the benefits and risks of freezing, and to record the donors' desires for disposition of the frozen preembryos at the time the form is executed in order to provide the clinic with guidance if the donors (as a unit) no longer wish to use the frozen preembryos. The form does not state, and the record does not indicate, that the husband and wife intended the consent form to act as a binding agreement between them should they later disagree as to the disposition. Rather, it appears that it was intended only to define the donors' relationship as a unit with the clinic." *A.Z.*, 725 N.E.2d at 1056.

In any event, the court concluded:

> "[E]ven had the husband and the wife entered into an unambiguous agreement between themselves regarding the disposition of the frozen preembryos, we would not enforce an agreement that would compel one donor to become a parent against his or her will. As a matter of public policy, we conclude that forced procreation is not an area amenable to judicial enforcement." *A.Z.*, 725 N.E.2d at 1057-58.

Thus, while a majority of courts utilize the contractual approach and have sought to give effect to the parties' advance directives regarding the disposition of pre-embryos, there is not a unanimous view that such agreements are within the public interest. The next approach places the emphasis on the contemporaneous desires of the parties.

¶ 27                    2. The Contemporaneous Mutual Consent Approach

¶ 28     The second approach applied by courts is known as the contemporaneous mutual consent model. This approach proposes that " 'no embryo should be used by either partner, donated to another patient, used in research, or destroyed without the [contemporaneous] mutual

consent of the couple that created the embryo.' " *Witten*, 672 N.W.2d at 778 (quoting Coleman, *supra*, at 110). Under this approach,

> " 'advance instructions would not be treated as binding contracts. If either partner has a change of mind about disposition decisions made in advance, that person's current objection would take precedence over the prior consent. If one of the partners rescinds an advance disposition decision and the other does not, the mutual consent principle would not be satisfied and the previously agreed-upon disposition decision could not be carried out.

> \*\*\*

> When the couple is unable to agree to any disposition decision, the most appropriate solution is to keep the embryos where they are–in frozen storage. Unlike the other possible disposition decisions–use by one partner, donation to another patient, donation to research, or destruction–keeping the embryos frozen is not final and irrevocable. By preserving the status quo, it makes it possible for the partners to reach an agreement at a later time.' " *Witten*, 672 N.W.2d at 778 (quoting Coleman, *supra*, at 110-12).

Like the contractual approach, the contemporaneous mutual consent approach acknowledges that " 'decisions about the disposition of frozen embryos belong to the couple that created the embryo, with each partner entitled to an equal say in how the embryos should be disposed.' " *Witten*, 672 N.W.2d at 777 (quoting Coleman, *supra*, at 81). However, it addresses many of the concerns with the contractual approach by allowing a party to change his or her mind prior to use of the pre-embryos. See *Witten*, 672 N.W.2d at 777-78.

¶ 29 The contemporaneous mutual consent approach is not immune from criticism either, though. While the approach benefits from ease of application and at least the appearance of respecting the rights of the parties' involved, the Superior Court of Pennsylvania has aptly noted: "This approach strikes us as being totally unrealistic. If the parties could reach an agreement, they would not be in court." *Reber*, 42 A.3d at 1135 n.5.

¶ 30 Iowa is the only state to have expressly adopted the contemporaneous mutual consent approach. See *Witten*, 672 N.W.2d at 783. In *Witten*, a husband and wife underwent *in vitro* fertilization because the wife was unable to conceive children naturally. *Witten*, 672 N.W.2d at 772. They signed an informed consent document entitled "Embryo Storage Agreement," which stated that " '[t]he Client Depositors \*\*\* understand and agree that containers of embryos stored pursuant to this agreement will be used for transfer, release or disposition only with the signed approval of both Client Depositors.' " *Witten*, 672 N.W.2d at 772. At trial on a dissolution action, the wife sought custody of the pre-embryos to have them implanted in her or a surrogate, but the husband did not want the wife to use them and requested a permanent injunction prohibiting either party from transferring, releasing, or utilizing the pre-embryos without both of their written consents. *Witten*, 672 N.W.2d at 772-73. On appeal, the Supreme Court of Iowa declined to adopt a contractual approach and held that "agreements entered into at the time *in vitro* fertilization is commenced are enforceable and binding on the parties, 'subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored embryo.' " *Witten*, 672 N.W.2d at 782 (quoting *J.B. v. M.B.*, 783 A.2d 707, 719 (N.J. 2001)). The court then noted

"grave public policy concerns" with a balancing test, and ultimately adopted the contemporaneous mutual consent approach, holding that there could be no use or disposition of the couple's pre-embryos unless the husband and wife reached an agreement. *Witten*, 672 N.W.2d at 783.

¶ 31 One commentator has noted that "the *Witten* opinion puts someone like [the husband] in a particularly powerful position." Mark P. Strasser, *You Take the Embryos But I Get the House (and the Business): Recent Trends in Awards Involving Embryos Upon Divorce*, 57 Buff. L. Rev. 1159, 1210 (2009). He notes:

> "For example, the court said that the party opposing destruction of the embryos would bear the costs of their cryopreservation. Someone who wanted to get back at an ex-spouse might well say that he or she had no interest in cryopreserving the embryos, thereby shifting the costs to his or her ex-spouse. Further, one could imagine such a person imposing continuing psychic damage by hinting that he or she might consent to the ex-spouse's use of the embryos sometime in the future–the ex-spouse might well continue to be on an emotional rollercoaster when considering the possibility of finally becoming a parent. Or the embryos might in effect be held hostage–they would be released for use only if the ex-spouse were willing to give up something valuable in return, for example, in a property settlement or in exchange for more favorable support terms." Strasser, *supra*, at 1210.

In this regard, the contemporaneous mutual consent model "give[s] each progenitor a powerful bargaining chip at a time when individuals might very well be tempted to punish their soon-to-be ex-spouses," "[which] makes no sense and may invite individuals to hold hostage their ex-partner's ability to parent a biologically related child in order to punish or to gain other advantages." Strasser, *supra*, at 1225. The next approach attempts to address these concerns by placing the disposition decision exclusively in the hands of the court.

¶ 32                                   3. The Balancing Approach

¶ 33 The third and final approach is for the court to balance the interests of the parties. Under this approach, courts enforce contracts between the parties, at least to a point, then balance their interests in the absence of an agreement. Although this approach allows courts leeway to determine who is entitled to use pre-embryos absent an agreement regarding disposition, the Supreme Court of Iowa has criticized this approach for its internal inconsistency, noting:

> "Public policy concerns similar to those that prompt courts to refrain from enforcement of contracts addressing reproductive choice demand even more strongly that we not substitute the courts as decision makers in this highly emotional and personal area. Nonetheless, that is exactly what happens under the decisional framework based on the balancing test because the court must weigh the relative interests of the parties in deciding the disposition of embryos when the parties cannot agree." *Witten*, 672 N.W.2d at 779.

Notwithstanding this concern, the balancing approach has been applied in three states. See *J.B. v. M.B.*, 783 A.2d 707, 719 (N.J. 2001) (New Jersey); *Reber*, 42 A.3d at 1135 (Pennsylvania); *Davis*, 842 S.W.2d at 603 (Tennessee).

¶ 34     The first court to resort to balancing the interests of the parties was the Supreme Court of Tennessee in *Davis*. *Reber*, 42 A.3d at 1135. In that case, as discussed earlier, the court initially looked to whether there was an agreement between the parties. Then, having found no agreement, the court turned to balancing the interests of the parties, noting:

> "Resolving disputes over conflicting interests of constitutional import is a task familiar to the courts. One way of resolving these disputes is to consider the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions. In this case, the issue centers on the two aspects of procreational autonomy–the right to procreate and the right to avoid procreation. We start by considering the burdens imposed on the parties by solutions that would have the effect of disallowing the exercise of individual procreational autonomy with respect to these particular preembryos." *Davis*, 842 S.W.2d at 598, 603.

There, the court ultimately concluded that the wife's interest in donating the pre-embryos to another couple was not as significant as the husband's interest in avoiding parenthood where "he would face a lifetime of either wondering about his parental status or knowing about his parental status but having no control over it." *Davis*, 842 S.W.2d at 604.

¶ 35     The next court to adopt a balancing approach was the Supreme Court of New Jersey in *J.B.* In that case, a husband and wife underwent *in vitro* fertilization after wife learned that she had a condition which prevented her from becoming pregnant. *J.B. v. M.B.*, 783 A.2d 707, 709 (N.J. 2001). They signed a consent form stating that they agreed that " 'all control, direction, and ownership of our tissues will be relinquished to the IVF Program under the following circumstances *** [a] dissolution of our marriage by court order, unless the court specifies who takes control and direction of the tissues.' " (Emphasis omitted.) *J.B.*, 783 A.2d at 709, 713. When the wife filed for divorce, the trial court granted her the right to destroy the remaining pre-embryos. *J.B.*, 783 A.2d at 710-11. The husband appealed, arguing that the trial court should have enforced an alleged agreement between J.B. and M.B. that the pre-embryos should be donated to infertile couples in the event the couple chose not to implant them in J.B. On appeal, the Supreme Court of New Jersey adopted a rule "to enforce agreements entered into at the time *in vitro* fertilization is begun, subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored preembryos." *J.B.*, 783 A.2d at 719. Then, "if there is disagreement as to disposition because one party has reconsidered his or her earlier decision, the interests of both parties must be evaluated." *J.B.*, 783 A.2d at 719. Applying this rule, the court found that the consent form did not manifest a clear intent by the couple regarding disposition of the pre-embryos because it allowed the parties to obtain a court order directing their disposition in the event of divorce. *J.B.*, 783 A.2d at 713. The court thus turned to balancing the parties interests, finding that the husband's right to procreate would not be lost if he was denied an opportunity to use or donate the pre-embryos because he was "already a father and is able to become a father to additional children, whether through natural procreation or further in vitro fertilization," but that the wife's right not to procreate could be lost through attempted use or through donation of the pre-embryos. *J.B.*, 783 A.2d at 717. Under the circumstances, the court concluded that it would "not force [the wife] to become a biological parent against her will." *J.B.*, 783 A.2d at 717.

¶ 36    Most recently, the Superior Court of Pennsylvania applied a balancing approach in *Reber*. In that case, a husband and wife underwent *in vitro* fertilization to preserve the wife's ability to conceive a child after she was diagnosed with breast cancer and prescribed cancer treatments. *Reber*, 42 A.3d at 1132-33. The husband subsequently filed for divorce, and the wife sought their pre-embryos for implantation. *Reber*, 42 A.3d at 1133. After balancing the parties' interests, the trial court awarded the wife the pre-embryos based on her inability to achieve biological parenthood without use of the pre-embryos. *Reber*, 42 A.3d at 1134. On appeal, the Superior Court of Pennsylvania noted that it did not need to decide whether to adopt a specific approach because the couple had not signed the portion of the consent form related to the disposition of the pre-embryos in the event of divorce, and "it was quite obvious that Husband and Wife could not come to a contemporaneous mutual agreement regarding the pre-embryos." *Reber*, 42 A.3d at 1136. Under the circumstances, the court found that "the balancing approach [was] the most suitable test" and concluded that the balance of interests weighed in the wife's favor because "Husband and Wife never made an agreement prior to undergoing IVF, and these pre-embryos are likely Wife's only opportunity to achieve biological parenthood and her best chance to achieve parenthood at all." *Reber*, 42 A.3d at 1136, 1142.

¶ 37    Courts applying the balancing approach have noted that a party's inability to have a child weighs in his or her favor. See *Reber*, 42 A.3d at 1140; *Davis*, 842 S.W.2d at 604 (noting that "[t]he case would be closer if [wife] were seeking to use the preembryos herself, but only if she could not achieve parenthood by any other reasonable means"); but see *J.B. v. M.B.*, 783 A.2d 707, 720 (N.J. 2001) (expressing "no opinion in respect of a case in which a party who has become infertile seeks use of stored preembryos against the wishes of his or her partner, noting only that the possibility of adoption also may be a consideration, among others, in the court's assessment"). However, none of these courts have awarded one party the right to implant pre-embryos in the face of a prior agreement stating that both parties' consents were required to make use of the pre-embryos.

¶ 38                    C. The Proper Approach

¶ 39    In the case at bar, the parties urge this court to apply different approaches: appellant argues that this court should apply the contemporaneous mutual consent approach adopted by the Supreme Court of Iowa in *Witten*; and appellee argues that this court should either enforce the parties' agreements or balance their interests as in *Reber*. The reasons for the parties' respective positions are self-evident. If this court adopts the contemporaneous mutual consent approach, requiring the consent of both appellant and appellee prior to use of the pre-embryos, appellant prevails because he has the power to unilaterally prevent use of the pre-embryos by withholding his consent. If this court adopts the contractual or balanced interests approach, appellee can argue that the parties had an agreement allowing her to use the pre-embryos, and if this court finds no such agreement, she can still argue that she has a compelling interest in the pre-embryos as a result of her infertility.

¶ 40    Having considered the arguments of the parties and case law from other jurisdictions, we believe that the best approach for resolving disputes over the disposition of pre-embryos

created with one party's sperm and another party's ova is to honor the parties' own mutually expressed intent as set forth in their prior agreements. We therefore join those courts that have held that "[a]greements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them." *Kass*, 696 N.E.2d at 180.

¶ 41 We believe that honoring parties' agreements properly allows them, rather than the courts, to make their own reproductive choices while also providing a measure of certainty necessary to proper family planning. We also believe that honoring such agreements will promote serious discussions between the parties prior to participating in *in vitro* fertilization regarding their desires, intentions, and concerns. The American Medical Association has expressed similar sentiments, stating, "Advance agreements are recommended for deciding the disposition of frozen pre-embryos in the event of divorce or other changes in circumstances. Advance agreements can help ensure that the gamete providers undergo IVF and pre-embryo freezing after a full contemplation of the consequences ***." AMA Code of Medical Ethics Op. 2.141 (June 1994). Although we acknowledge the concern that individuals may change their minds regarding parenthood during the process of *in vitro* fertilization, we note that this concern can be adequately addressed in a contract and should be discussed in advance of the procedure. We do not believe, however, that such a concern should allow one party's indecisiveness to plague a process, fraught with emotions and lifelong repercussions, with uncertainty at another's expense.

¶ 42 In addition to holding that agreements between the parties should be honored, we further hold that where there has been no advance agreement regarding the disposition of pre-embryos, "then the relative interests of the parties in using or not using the preembryos must be weighed." *Davis*, 842 S.W.2d at 604. Although we acknowledge that this is not an ideal way to resolve a dispute implicating reproductive rights, we note that "what is even worse *** is to give a possibly antagonized ex-spouse the power to either block parentage or to name the price that potential parentage will cost." Strasser, *supra*, at 1225. We note that under a balancing approach:

> "Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered. However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail." *Davis*, 842 S.W.2d at 604.

In reaching these holdings, we have considered appellant's arguments against the contractual and balancing approaches and find them to be without merit.

¶ 43 Appellant argues that "a contract to create and use pre-embryos is the same as a contract to engage in sexual intercourse," and thus void *ab initio*. He also argues that Illinois public policy requires the couples' consent for any use of the pre-embryos "at the time of the proposed use." We disagree. There is simply no credible basis to find that the process of *in vitro* fertilization is the equivalent of two persons engaging in sexual intercourse, and

appellant fails to cite any clear public policy against contracts for the right to use pre-embryos created with one party's sperm and another party's eggs. In fact, we find that, contrary to his claim, Illinois public policy would seem to favor such contracts given that the Illinois legislature has specifically provided for contracts in surrogacy situations and set forth the requirements thereof. 750 ILCS 47/25 (West 2010).

¶ 44　　Appellant further argues that "his constitutional right not to be a parent means his consent is required for any use of the pre-embryos at the time of their use." In making this argument, appellant cites federal abortion case law and claims that "the right to an abortion is a semantic recasting of the right not to be a parent." However, he claims that

> "unlike in the abortion context, in the context of cryopreserved pre-embryos the man and woman are in equal positions. And with this equality of positions comes the equality of the respective constitutional rights of a woman and man to control the use of the pre-embryos. As a result, the constitutional right not to be a parent means the consent of both the woman and the man is required for any use of the pre-embryos."

In other words, appellant has essentially derived a right for him to unilaterally prohibit the use of a pre-embryo created with his sperm and appellee's egg, without regard to appellee's interests in the pre-embryo, from the fact that a woman has a constitutional right to terminate her pregnancy. This arguments is without basis. We note that individuals may waive their constitutional rights, whether by contract or otherwise (see *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 937 (2000)), and that the right to terminate a pregnancy, itself, is subject to a balancing of the interests involved. For instance, in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 71 (1976), the Supreme Court noted:

> "The obvious fact is that when the wife and the husband disagree on [the decision to terminate a pregnancy], the view of only one of the two marriage partners can prevail. Inasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between the two, the balance weighs in her favor."

Similarly, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992), the Supreme Court addressed the interests of the State with respect to termination of a pregnancy:

> "It must be stated at the outset and with clarity that *Roe*'s essential holding, the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child."

We thus find no constitutional obstacle to honoring an agreement regarding the disposition of pre-embryos, and where there has been no advance agreement regarding the disposition

of pre-embryos, then to balance the parties' interests in the event of a dispute.

¶ 45    Appellant lastly argues that the Illinois Constitution requires the parties' consent to the use of pre-embryos at the time of their use, relying on the same arguments raised in support of his federal constitutional claim, but with the added assertion that "the right of privacy under the Illinois Constitution is broader than its federal counterpart." Appellant refers to the following legislative history in support of his claim that the broader Illinois right to privacy requires contemporaneous consent to use of the pre-embryos:

> "The delegates considered an amendment from the floor that would have stricken the privacy clause from article I, section 6. During the debate on this amendment, the chairman of the Bill of Rights Committee commented:
>
> ***
>
> The chairman offered the example of devices that could 'penetrate walls and can view what's going on' inside a person's home, revealing 'bedtime intimacies and private conversations,' as the kind of unreasonable invasion of privacy that should be prohibited. [Citation.] The amendment failed and the privacy clause became a part of our state constitution." *People v. Caballes*, 221 Ill. 2d 282, 318-19 (2006).

Although appellant claims that "[t]he technological advances that make IVF and cryopreservation possible constitute the 'additional or more effective means by which privacy can be invaded,' " and that "the decision whether to be a parent constitutes the most basic and fundamental of bedroom intimacies," he does not explain why the Illinois right to privacy would preclude this court from honoring a contract governing the disposition of pre-embryos or in the absence of a contract balancing the interests of the parties in the event of a dispute over their use. We therefore find this argument unpersuasive and turn to whether the parties previously agreed on a disposition of the pre-embryos.

¶ 46                    D. The Informed Consent and the Co-Parent Agreement

¶ 47    In this case, appellant maintains that the informed consent executed by the parties is a valid contract which prevents use of the pre-embryos without his consent. Specifically, he claims that the informed consent is an expression of both his and appellee's intent that the pre-embryos cannot be used without both of their consents.

¶ 48    Appellee claims that appellant has misinterpreted the informed consent and argues that it is "simply the document by which the hospital sets forth its *own* policies regarding the control of pre-embryos." (Emphasis in original.) She also counters that appellant agreed to the subsequently written co-parent agreement where he promised that he would sign it, then performed his one critical obligation by providing sperm to create the pre-embryos.

¶ 49    Appellant replies that he never promised to sign the co-parent agreement and never agreed to its terms. He also claims that he did not perform under the co-parent agreement because he told appellee that "we needed to discuss it," and he was "simply honoring the prior commitment he had made on March 25."

¶ 50    Being a case of first impression, the circuit court did an admirable job of considering the alternative approaches taken by other states' courts in addressing the issue of how to determine the disposition of cryopreserved pre-embryos created with one party's sperm and

another party's ova. Obviously, the parties did not know which approach the circuit court would adopt prior to the circuit court applying the balancing approach and entering summary judgment in favor of the appellee. As we have explained, the proper test to apply is the contractual approach. Consequently, we vacate the entry of summary judgment in favor of the appellee. As the parties were unable to present evidence in support of their respective positions in light of the contractual approach, we remand this matter to the circuit court to apply the contractual approach to any facts previously adduced and to any facts the parties wish to present on remand. This court retains jurisdiction over this matter and we instruct the circuit court and the parties to conclude any additional litigation they deem necessary within 180 days of this court issuing our mandate.

¶ 51          Reversed and remanded with instructions.