******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JESSICA BILBAO *v.* TIMOTHY R. GOODWIN
## (SC 20078)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court dissolving his
marriage to the plaintiff and awarding her certain pre-embryos that the
parties had cryopreserved after having created them through in vitro
fertilization during their marriage. The parties had entered into a storage
agreement with the reproductive services center responsible for cryo-
preserving the pre-embryos. The storage agreement contained checkbox
options that provided for disposition of the pre-embryos under certain
circumstances. The parties checked the box indicating that they agreed
to have the pre-embryos discarded in the event that they divorced,
initialed their selection, and signed the agreement. The plaintiff asked
the trial court to order that the pre-embryos be discarded in accordance
with the storage agreement, whereas the defendant claimed that he had
changed his mind, was no longer bound by that provision of the storage
agreement, and wanted the pre-embryos preserved so that the parties
could have children in the event that they reconciled or, in the alternative,
wanted the pre-embryos to be donated. The trial court determined that
the storage agreement was not enforceable because it lacked consider-
ation. The court then awarded the pre-embryos to the plaintiff, conclud-
ing that the plaintiff's interest in them outweighed the defendant's inter-
est. On appeal, the defendant claimed that the trial court incorrectly
determined that a pre-embryo is property subject to distribution under
the statute (§ 46b-81) governing distribution of the marital estate upon
divorce and also claimed that, even if it is property, in the absence of
an enforceable contractual agreement, the court failed to employ a legal
presumption in his favor as the party seeking to preserve the pre-embryos
because they are human beings. *Held*:

1. This court concluded that the contractual approach to determining the
   disposition of a pre-embryo upon divorce, pursuant to which an agree-
   ment between progenitors governing the disposition of a pre-embryo
   is presumed valid and enforceable in a dispute between them, is the
   appropriate first step in such a determination, reasoning that progenitors
   should be the primary decision makers regarding the disposition of their
   pre-embryos, there are significant benefits to making such a decision
   in advance rather than at the moment of disposition, such an approach
   is consistent with Connecticut's public policy and the current practices
   of most state courts that have confronted the issue, and various profes-
   sional associations focusing on the field of reproductive medicine recom-
   mend advance directives regarding the disposition of pre-embryos in
   the event of divorce; moreover, this court clarified that such an approach
   applies in cases in which an agreement, if enforced, will not result in
   procreation and declined to decide whether such an approach would
   apply to a scenario in which one party would be compelled to become
   a genetic parent against his or her wishes or what approach a court
   should take in the absence of an enforceable agreement.

2. The trial court incorrectly determined that the parties had not entered
   into an enforceable agreement to discard the pre-embryos upon divorce,
   and, accordingly, this court reversed the trial court's judgment insofar
   as that court determined that their agreement was not enforceable,
   vacated the trial court's order awarding the pre-embryos to the plaintiff,
   and remanded the case with direction to order the disposition of the
   pre-embryos in accordance with the agreement: there was an offer and
   an acceptance of definite terms, as each party offered the other the
   opportunity to create pre-embryos by contributing gametic material
   under the terms of the agreement, and each party accepted the other's
   offer by signing the agreement and contributing gametic material; more-
   over, the trial court's determination that the storage agreement lacked
   consideration was clearly erroneous, as the plaintiff and the defendant
   made mutual promises to contribute gametic material, and the reproduc-

tive services center promised to store the pre-embryos in exchange for the certainty provided by the parties' election of a disposition in the event of the parties' divorce; furthermore, the trial court's focus on the checkbox nature of the storage agreement to conclude that the agreement was unenforceable was misplaced, as agreements in which parties use checkboxes to indicate their rights and responsibilities are not insufficient for that reason alone, checkboxes, sometimes accompanied by the parties' initials, are routinely used in important and binding legal documents, and any suggestion that the checkboxes were evidence that the parties had not seriously considered the matter of disposition was contradicted by the storage agreement and the parties' testimony.

3. This court having determined that there was an enforceable agreement, the defendant could not prevail on his claims that, in the absence of a contractual agreement, a pre-embryo is not property within the meaning of § 46b-81 because it is a human life or, if it is deemed property, that the trial court should have applied a presumption in favor of preserving the pre-embryos, as those claims incorrectly presupposed that there was no enforceable contract between the parties; moreover, to the extent that the defendant claimed that an agreement that provides for the disposition of a pre-embryo is unenforceable on the ground that a pre-embryo is a human life, this court declined to review that claim for lack of an adequate record, as the defendant did not raise such a claim at trial and did not even appear to make that argument on appeal.

Argued April 30—officially released November 5, 2019

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Nastri, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed. *Reversed in part*; *vacated in part*; *order directed*.

*Joseph P. Secola*, with whom, on the brief, was *Timothy R. Goodwin*, self-represented, for the appellant (defendant).

*Scott T. Garosshen*, with whom were *Brendon P. Levesque* and, on the brief, *Michael S. Taylor*, for the appellee (plaintiff).

*Leslie I. Jennings-Lax* and *Louise T. Truax* filed a brief for the Connecticut Chapter of the American Academy of Matrimonial Lawyers as amicus curiae.

*Rita Louise Lowery Gitchell*, pro hac vice, *Philip S. Walker* and *Joanne F. Davis* filed a brief for the American Association of Pro-Life Obstetricians and Gynecologists as amicus curiae.

*Opinion*

D'AURIA, J. In this appeal, we are called on to determine how pre-embryos created through in vitro fertilization should be distributed upon the divorce of their progenitors. The plaintiff, Jessica Bilbao, and the defendant, Timothy R. Goodwin, were married and underwent in vitro fertilization in an effort to have children. Several pre-embryos resulting from that treatment were stored for implantation in the future.[1] As part of a storage agreement with the fertility clinic, the parties unequivocally stated that they wanted the pre-embryos discarded if they ever divorced. Their marriage has since been dissolved, and the plaintiff now seeks to have the pre-embryos discarded in accordance with the storage agreement. The defendant argues that the agreement is unenforceable, however, and wants the pre-embryos preserved or donated. The trial court concluded that the storage agreement was unenforceable but awarded the pre-embryos to the plaintiff. We conclude that the storage agreement is enforceable and, therefore, reverse the trial court's judgment insofar as the court determined that the agreement was not enforceable.

The record reveals the following undisputed facts as found by the trial court and contained in exhibits submitted by the parties. The parties were married in 2011. Soon after, they began efforts to have a child through in vitro fertilization with the assistance of the University of Connecticut School of Medicine's Center for Advanced Reproductive Services (center). The treatment produced several pre-embryos, one of which was transferred to the plaintiff's uterus and resulted in the birth of a child. The center cryopreserved the remaining pre-embryos.[2]

Originally, the parties had planned to have another child using the remaining pre-embryos. But, together, they also planned for certain contingencies by entering into a storage agreement with the center: a four page form entitled "Consent for Cryopreservation and Storage of Embryos" that provided for the disposition of the pre-embryos upon death or divorce. Specifically, the agreement offered four checkbox options relative to divorce: leave the pre-embryos to the female party, to the male party, to a third-party designee of their choice, or have them "discarded according to American Society for Reproductive Medicine Ethical Guidelines." The parties opted to have the pre-embryos discarded, which they manifested by checking the appropriate box, initialing that selection, and signing the agreement in full on the next page. The parties also acknowledged in the agreement that they had discussed the agreement with a physician, and the agreement provided that the parties could modify their selection through written consent signed by both of them.

In September, 2016, the plaintiff filed this action for dissolution of marriage. With the assistance of counsel, the parties reached a settlement agreement that resolved all of their disputes except for the allocation of debt from a home loan and the disposition of the pre-embryos. The debt allocation is not part of this appeal. Regarding the pre-embryos, the plaintiff asked the trial court to order that they be discarded in accordance with the storage agreement. The defendant wanted the pre-embryos preserved so that the parties could try to have additional children in the event they reconciled or, alternatively, wanted the pre-embryos to be put up for adoption.[3]

The record also reveals the following procedural history. Although the parties each had counsel in drafting the settlement agreement, they represented themselves in this matter before the trial court. To resolve the disputes regarding the debt allocation and pre-embryos, the trial court held a brief proceeding at which both parties testified. The plaintiff submitted the settlement agreement and storage agreement as exhibits, but neither party filed a substantive motion, submitted a brief, or argued legal matters to the court.

The trial court issued a memorandum of decision in which it incorporated the settlement agreement and resolved the debt dispute. Regarding the pre-embryos, it determined that the storage agreement was not enforceable. In the absence of an enforceable agreement, the court proceeded as if the pre-embryos were "property" subject to distribution under General Statutes § 46b-81,[4] concluded that the plaintiff's interest in the pre-embryos outweighed the defendant's interest and, therefore, awarded them to her.

The defendant appealed to the Appellate Court from the trial court's judgment awarding the pre-embryos to the plaintiff. The appeal was then transferred to this court. See General Statutes § 51-199 (c); Practice Book § 65-1.

On appeal, the defendant appears to make two claims of error, both of which presuppose that the trial court correctly determined that the parties lacked an enforceable agreement. The defendant agrees with this portion of the trial court's analysis but disagrees with the trial court's determination that the plaintiff's interest in the pre-embryos outweighed his interest. Specifically, both of the defendant's claims are rooted in his factual premise that a pre-embryo is a human being. First, he claims that the trial court incorrectly determined that a pre-embryo is "property" subject to distribution under § 46b-81. Specifically, he argues that a pre-embryo is human life and, as such, must be awarded to the party seeking to preserve it. Second, he claims that, even if a pre-embryo is property under § 46b-81, the trial court improperly failed to employ a legal presumption in favor

of the party seeking to preserve it because it is a human being.[5]

In response, the plaintiff argues that the trial court was incorrect that the parties had no enforceable agreement and, therefore, urges us to affirm the judgment on this alternative ground. See Practice Book §§ 63-4 and 84-11. We agree with the plaintiff that the parties' agreement providing for the disposition of their pre-embryos upon divorce is enforceable. Our holding necessarily defeats the defendant's claims, which are premised on the prerequisite determination that the contract was unenforceable. To the extent that the defendant's claims include an argument that a contract requiring the destruction of pre-embryos is unenforceable as a matter of public policy because a pre-embryo is a human being, we find this issue unreviewable because he failed to present any evidence at trial to support the factual premise that a pre-embryo is a human being. See footnotes 5 and 8 of this opinion.

As a predicate to the defendant's claims, we first must determine whether the parties' storage agreement, which unambiguously provided that the pre-embryos should be discarded in the event of divorce, is enforceable between the plaintiff and the defendant. The trial court held that it was not enforceable because it lacked consideration and indicated the parties' disposition selection in the form of a checkbox. The defendant agrees with the trial court's analysis. The plaintiff argues that the agreement was supported by consideration and that the checkbox nature of the agreement did not render it insufficient. We agree with the plaintiff.

The following additional procedural history is relevant. At trial, the enforceability of the storage agreement was central to the dispute, and the parties' respective positions were clear. The plaintiff submitted the storage agreement as evidence and stated that she wanted its terms enforced, as the parties had originally agreed. The defendant admitted that he originally had agreed to discard the pre-embryos if the couple ever divorced but argued that he had since changed his mind and that this provision of the agreement no longer bound him.

In its memorandum of decision, the trial court noted the lack of Connecticut authority on this issue, considered the law in other jurisdictions, and adopted a two step approach to resolve the dispute. First, it would decide whether the parties had an enforceable agreement that provided for the disposition of the pre-embryos. Second, in the absence of an agreement, it would balance their respective interests in the pre-embryos. In conducting the first step, the trial court concluded that the consent form was not an enforceable agreement because it "was little more than a 'check the box questionnaire,'" which had "neither consideration nor a promise." It then proceeded to the second step,

determined that the plaintiff's interests in the pre-embryos outweighed the defendant's interests, and awarded them to her.

In the sections of this opinion that follow, we describe the current state of the law on pre-embryo disposition upon divorce and conclude that the trial court properly considered whether the parties had an enforceable agreement, but we also conclude that the trial court incorrectly determined that the storage agreement was unenforceable. We also clarify the narrow scope of our decision.

I

There are three leading approaches to determining the disposition of a pre-embryo upon divorce: (1) the contractual approach, (2) the balancing approach, and (3) the contemporaneous mutual consent approach. Each approach attempts to resolve disputes between progenitors by emphasizing different policies: the progenitors' autonomy in deciding the fate of pre-embryos created with their own gametic material, the reality that progenitors may change their minds as time passes, or both.

Under the contractual approach, an agreement between progenitors governing disposition of the pre-embryos is presumed valid and enforceable in a dispute between them. E.g., *In re Marriage of Rooks*, 429 P.3d 579, 595 (Colo. 2018), cert. denied sub nom. *Rooks* v. *Rooks*, U.S. , 139 S. Ct. 1447, 203 L. Ed. 2d 681 (2019). These agreements often appear as consent forms or storage agreements between progenitors and a fertility clinic. E.g., id., 587.

Proponents of the contractual approach primarily argue that this approach allows "the progenitors—not the [s]tate and not the courts . . . [to] make this deeply personal life choice." *Kass* v. *Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174, 673 N.Y.S. 2d 350 (1998). They also note that, by validating and enforcing a contract based rule, the approach promotes serious discussion between the progenitors in advance of divorce, gives progenitors and storage facilities a measure of certainty to plan for the future, and helps avoid costly and emotionally taxing litigation. See, e.g., *Terrell* v. *Torres*, 246 Ariz. 312, 318, 438 P.3d 681 (App. 2019), review granted, Arizona Supreme Court, Docket No. CV-19-0106-PR (August 27, 2019); *Szafranski* v. *Dunston*, 993 N.E.2d 502, 515 (Ill. App.), appeal denied, 996 N.E.2d 24 (Ill. 2013); *Kass* v. *Kass*, supra, 565–66.

Critics of this approach focus on the fact that pre-embryos can be stored indefinitely and that progenitors might change their minds about disposition as time passes. E.g., *Terrell* v. *Torres*, supra, 246 Ariz. 318 (contractual approach ignores "numerous uncertainties inherent in the [in vitro fertilization] process that extend . . . the viability of [embryos] indefinitely and allow

. . . time for minds, and circumstances, to change" [internal quotation marks omitted]); *In re Marriage of Witten*, 672 N.W.2d 768, 777 (Iowa 2003) (contractual approach "binds individuals to previous obligations, even if their priorities or values change" [internal quotation marks omitted]). For some commentators, the failure to account for changed circumstances can be so great that dispositional agreements "smack of unconscionability." E. Waldman, "Disputing Over Embryos: Of Contracts and Consents," 32 Ariz. St. L.J. 897, 926 (2000).

Under the balancing approach, a court weighs each progenitor's interest in the pre-embryos. Factors to consider include the intended use of the pre-embryos, the ability of each respective spouse to reproduce through other means, reasons for pursuing in vitro fertilization, emotional consequences, and bad faith. See, e.g., *In re Marriage of Rooks*, supra, 429 P.3d 588, 592–93.

New Jersey has adopted this approach as the first and only step in resolving disputes over the disposition of pre-embryos upon divorce. See *J.B.* v. *M.B.*, 170 N.J. 9, 29, 783 A.2d 707 (2001). The New Jersey Supreme Court has emphasized that it permits progenitors to reconsider their initial stances up to the point of disposition, which is consistent with that state's public policy of preserving parental rights "in all but statutorily approved circumstances." Id., 27. But most courts use the balancing approach as a second step, only to be employed after it is determined that no enforceable agreement between the progenitors exists and, thus, that the contractual approach does not resolve the issue. See, e.g., *In re Marriage of Rooks*, supra, 429 P.3d 593; *Reber* v. *Reiss*, 42 A.3d 1131, 1136 (Pa. Super.), appeal denied, 619 Pa. 680, 62 A.3d 380 (2012); *Davis* v. *Davis*, 842 S.W.2d 588, 604 (Tenn. 1992), cert. denied sub nom. *Stowe* v. *Davis*, 507 U.S. 911, 113 S. Ct. 1259, 122 L. Ed. 2d 657 (1993). This is because the balancing approach ultimately puts the disposition of a pre-embryo in the hands of a court and not in the hands of the progenitors.

Under the contemporaneous mutual consent approach, both progenitors must agree to a disposition at the time of the disposition. See *In re Marriage of Witten*, supra, 672 N.W.2d 783 ("no transfer, release, disposition, or use of the embryos can occur without the signed authorization of both donors"). If the parties do not agree, the pre-embryos remain in storage indefinitely. See id.

This third approach attempts to accommodate the competing principles driving both the contractual approach—progenitors, not courts, should decide the disposition of their pre-embryos—and the balancing approach—progenitors should be allowed to change their minds at any point. Id., 782. Only Iowa has affirmatively adopted this approach, however. See id., 783; see

also *McQueen* v. *Gadberry*, 507 S.W.3d 127, 157 (Mo. App. 2016) (upholding trial court decision that relied on contemporaneous mutual consent approach when parties had no enforceable agreement). Other courts have criticized the contemporaneous mutual consent approach as "totally unrealistic"; *Reber* v. *Reiss*, supra, 42 A.3d 1135 n.5; see also id. ("[i]f the parties could reach an agreement, they would not be in court"); and unfair because it "gives one party a de facto veto over the other party by avoiding any resolution until the issue is eventually mooted by the passage of time" and creates "incentives for one party to leverage his or her power . . . ." *In re Marriage of Rooks*, supra, 429 P.3d 589.

A majority of states that have addressed the issue employ the contractual approach as the first step in resolving a dispute over pre-embryos upon divorce. To date, courts in eight states have done so. See *Terrell* v. *Torres*, supra, 246 Ariz. 320; *In re Marriage of Rooks*, supra, 429 P.3d 592; *Szafranski* v. *Dunston*, supra, 993 N.E.2d 514; *Kass* v. *Kass*, supra, 91 N.Y.2d 564–66; *In re Marriage of Dahl*, 222 Or. App. 572, 583, 194 P.3d 834 (2008), review denied, 346 Or. 65, 204 P.3d 95 (2009); *Davis* v. *Davis*, supra, 842 S.W.2d 597; *Roman* v. *Roman*, 193 S.W.3d 40, 50 (Tex. App. 2006), review denied, Texas Supreme Court, Docket No. 06-554 (August 24, 1997), cert. denied, 552 U.S. 1258, 128 S. Ct. 1662, 170 L. Ed. 2d 356 (2008); *Litowitz* v. *Litowitz*, 146 Wn. 2d 514, 528, 48 P.3d 261 (2002), cert. denied, 537 U.S. 1191, 123 S. Ct. 1271, 154 L. Ed. 2d 1025 (2003). Courts in two states have expressly reserved decision on whether to adopt the contractual approach because an enforceable contract did not exist in the cases in which the question arose. See *McQueen* v. *Gadberry*, supra, 507 S.W.3d 156 n.32; id., 157 (upholding trial court decision relying on contemporaneous mutual consent approach); *Reber* v. *Reiss*, supra, 42 A.3d 1136 (applying balancing approach). One state court has expressly declined to enforce a contract that was to result in the implantation of pre-embryos but reserved decision on whether it would enforce a contract that would result in the discarding of pre-embryos. See *A.Z.* v. *B.Z.*, 431 Mass. 150, 159, 160 n.22, 725 N.E.2d 1051 (2000) (upholding trial court's decision relying on balancing approach). And, as we discussed previously, two state courts have expressly rejected the contractual approach in favor of either the balancing approach; see *J.B.* v. *M.B.*, supra, 170 N.J. 29–30; or the contemporaneous mutual consent approach. See *In re Marriage of Witten*, supra, 672 N.W.2d 783.

II

The standard of review applicable to the enforceability of dispositional agreements presents a question of law; therefore, our review is plenary. See, e.g., *Bedrick* v. *Bedrick*, 300 Conn. 691, 697, 17 A.3d 17 (2011). We

conclude that the contractual approach is the appropriate first step in determining the disposition of pre-embryos upon divorce for several reasons.

First, we agree with courts adopting the contractual approach that, when possible, progenitors should be the primary decision makers regarding disposition of their pre-embryos. This "maximize[s] procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision." *Kass* v. *Kass*, supra, 91 N.Y.2d 565. It "is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the [pre-embryos], retain decision-making authority as to their disposition." *Davis* v. *Davis*, supra, 842 S.W.2d 597.

Second, there are significant benefits to making this decision in advance, rather than at the moment of disposition. Preexisting agreements "promote serious discussions between the parties prior to participating in in vitro fertilization"; *Szafranski* v. *Dunston*, supra, 993 N.E.2d 515; and manifest choices "made before disputes erupt . . . ." *Kass* v. *Kass*, supra, 91 N.Y.2d 566. This "minimize[s] misunderstandings" that might arise in the future, provides certainty for progenitors and fertility clinics, and decreases the likelihood of litigation. Id., 565; see also *Szafranski* v. *Dunston*, supra, 515.

Of course, as in the present case, progenitors might change their preferences for disposition as time passes. Although the contractual approach prioritizes progenitor autonomy and certainty over an absolute ability to change one's mind, as offered by the balancing and contemporaneous mutual consent approaches, advance directives that permit joint, written modifications address this concern by offering a measure of flexibility. See, e.g., *Terrell* v. *Torres*, supra, 246 Ariz. 319 ("[c]ourts have addressed these concerns by permitting parties to subsequently jointly modify their initial agreement"); *Kass* v. *Kass*, supra, 91 N.Y.2d 566 ("advance directives, subject to mutual change of mind that must be jointly expressed, both minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision"); *Davis* v. *Davis*, supra, 842 S.W.2d 597 ("[p]roviding that the initial agreements may later be modified by agreement will, we think, protect the parties against some of the risks they face in this regard"); *Roman* v. *Roman*, supra, 193 S.W.3d 50 (allowing parties voluntarily to decide disposition of frozen embryos in advance of cryopreservation, subject to mutual change of mind, jointly expressed, best serves public policy and parties' interests). This seems particularly reasonable in light of the asymmetrical consequences, under the contemporaneous mutual consent approach, of changing one's mind. To the extent one party benefits from the option to

change his or her dispositional preference, the other party is deprived of the agreement he or she originally bargained for and relied on in agreeing to create the pre-embryos.

Third, the contractual approach is consistent with Connecticut's public policy. By statute, a fertility clinic must provide a progenitor with "timely, relevant and appropriate information sufficient to allow that person to make an informed and voluntary choice regarding the disposition of any embryos," including "the option of storing, donating to another person, donating for research purposes, or otherwise disposing of any unused embryos . . . ." General Statutes § 32-41jj (c) (1) and (2). Moreover, the contractual approach is consistent with the state's well settled policy of enforcing intimate partner agreements; see, e.g., General Statutes § 46b-66 (settlement agreement); General Statutes § 46b-36g (premarital agreement); *Bedrick* v. *Bedrick*, supra, 300 Conn. 698–99 (postnuptial agreement); *Boland* v. *Catalano*, 202 Conn. 333, 342, 521 A.2d 142 (1987) (agreement between unmarried cohabitants); and gestational agreements. See, e.g., General Statutes § 7-48a (permitting intended parents in gestational agreement to obtain birth certificate). In many cases, these agreements "encourage the private resolution of family issues. In particular, they may allow couples to eliminate a source of emotional turmoil . . . ." *Bedrick* v. *Bedrick*, supra, 698.

Fourth, the contractual approach accords with the current practices of most state courts that have confronted the issue. As discussed previously, a substantial majority of state courts that have addressed the pre-embryo disposition issue have applied the contractual approach when an enforceable contract exists. See part I of this opinion. The contractual approach furthers this policy of informed consent regarding the disposition of pre-embryos. Moreover, at least one state legislature requires progenitors to enter into disposition agreements; Fla. Stat. Ann. § 742.17 (West 2016); and, as in Connecticut, at least three other state legislatures require that fertility clinics provide progenitors with options for disposition in the event of various contingencies. See Cal. Health & Safety Code § 125315 (Deering 2012); Mass. Gen. Laws Ann. c. 111L, § 4 (LexisNexis 2018); N.J. Stat. Ann. § 26:2Z-2 (West 2018). But see, e.g., Ariz. Rev. Stat. Ann. § 25-318.03 (A) (1) (2018) (in divorce proceeding, awarding pre-embryo "to spouse who intends to allow the in vitro human pre-embryos to develop to birth," regardless of disposition agreement); La. Stat. Ann. § 9:129 (Supp. 2018) ("[a] viable in vitro fertilized human ovum is a juridical person which shall not be intentionally destroyed").

Finally, various professional associations focusing on the field of reproductive medicine recommend that progenitors provide advance directives regarding dis-

position of their pre-embryos in various scenarios, including divorce. E.g., Ethics Committee of the American Society for Reproductive Medicine, "Disposition of Abandoned Embryos: A Committee Opinion," 99 Fertility & Sterility 1848, 1848 (2013), available at https://www.asrm.org/globalassets/asrm/asrm-content/news-and-publications/ethics-committee-opinions/disposition_of_abandoned_embryos-pdfmembers.pdf (last visited October 29, 2019); see also American Medical Association, Code of Medical Ethics (2017) Opinion 4.2.5, pp. 70–71. Advance directives provide practical certainty for storage facilities, reduce the likelihood of abandonment, and ensure that facilities will be able to satisfy their ethical obligations.

Therefore, we conclude that, in the absence of formal legislative guidance on the question, the contractual approach is the appropriate first step in determining the disposition of pre-embryos upon divorce. As set forth in part IV of this opinion, we do not decide how a court should determine the disposition of pre-embryos in the absence of an enforceable agreement.

### III

Finally, we conclude that the trial court incorrectly determined that the parties had not entered into an enforceable agreement in this case.

As set forth previously, the trial court concluded that the storage agreement was not an enforceable contract because it "was little more than a 'check the box questionnaire,' " which had "neither consideration nor a promise." In support of this conclusion, it cited *Rucker* v. *Rucker*, Docket No. A16-0942, 2016 WL 7439094 (Minn. App. December 27, 2016).

Although a disposition agreement between progenitors is presumed enforceable between them; e.g., *In re Marriage of Rooks*, supra, 429 P.3d 592; there must be an offer and acceptance of definite terms. See, e.g., *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 830, 95 A.3d 1063 (2014). Also, "a contract must be supported by valuable consideration." *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 366, 659 A.2d 172 (1995). "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 440–41, 927 A.2d 843 (2007). "[T]he exchange of promises is sufficient consideration . . . ." *Christophersen* v. *Blount*, 216 Conn. 509, 511 n.3, 582 A.2d 460 (1990). In the present case, the trial court found that there were no promises exchanged between the parties and no consideration. To the extent that the trial court found that there was no exchange of promises and, thus, no consideration, we review the trial court's findings for clear error. See, e.g., *Viera* v. *Cohen*, supra, 442; see also id. (whether agreement is supported by consider-

ation is factual issue reviewed under clearly erroneous standard). To the extent that the trial court found that there was insufficient consideration, our review is plenary. See, e.g., *Milaneseo* v. *Calvanese*, 92 Conn. 641, 643, 103 A. 841 (1918) (adequacy of consideration is conclusion of law subject to plenary review).[6]

Neither party contests the existence of their offer and acceptance of definite terms. They each offered one another the opportunity to create pre-embryos by contributing gametic material under the terms spelled out in the agreement, including the unambiguous condition that the pre-embryos would be discarded if they ever divorced. Each party accepted this offer by signing the agreement, even specifically indicating their "understand[ing], agree[ment] and consent" that the pre-embryos would be discarded upon divorce by initialing directly below that option in the agreement. If there was any doubt, they further indicated their assent by performing (i.e., their contribution of gametic material).

Moreover, the parties do not dispute that, to the extent that they entered into a contract, the contract is enforceable as against each other. We note that other jurisdictions have determined that a pre-embryo storage agreement, entered into by a fertility clinic and the progenitors, that provides for the disposition of the pre-embryos is presumed enforceable not only against the clinic but also as between the progenitors. See *Kass* v. *Kass*, supra, 91 N.Y.2d 565 ("[a]greements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them"); see also *In re Marriage of Rooks*, supra, 429 P.3d 592 (holding "that a court should look first to any existing agreement expressing the spouses' intent regarding disposition of the couple's remaining pre-embryos in the event of divorce"); *Roman* v. *Roman*, supra, 193 S.W.3d 48 (noting that case law evinces "emerging majority view that written embryo agreements between embryo donors and fertility clinics . . . are valid and enforceable").

The trial court's finding that the storage agreement lacked a mutual exchange of promises between the plaintiff and the defendant and, thus, lacked consideration was clearly erroneous for three reasons. First, the parties made mutual promises to contribute gametic material. Specifically, in exchange for the plaintiff's promise to contribute gametic material under the terms of the agreement, the defendant promised to contribute gametic material under the terms of the agreement, and vice versa. Moreover, in exchange for the certainty provided by the parties' election of a disposition in the event of divorce, the center promised to store the pre-embryos. Thus, all parties to the agreement received consideration. Additionally, to the extent that the trial court found that this exchange of promises was inade-

quate consideration, as a matter of law, we disagree. Although no court has directly addressed the issue in the context of pre-embryo disposition agreements, courts and commentators have opined that this exchange of promises is sufficient. See, e.g., *Roman* v. *Roman*, supra, 193 S.W.3d 50 n.14 ("consideration in embryo agreements is the gamete donation process that both husband and wife experience"); D. Forman, "Embryo Disposition and Divorce: Why Clinic Consent Forms Are Not the Answer," 24 J. Am. Acad. Matrim. Law. 57, 103 n.180 (2011) ("contracts also typically require consideration, which in this type of case may be provided by the gamete donation process undergone by both husband and wife"). Generally, though, it is well settled that "the exchange of promises is sufficient consideration . . . ." *Christophersen* v. *Blount*, supra, 216 Conn. 511 n.3.

Second, the trial court's focus on the checkbox nature of the storage agreement to conclude that the agreement was unenforceable was misplaced. An agreement in which parties indicate rights or responsibilities by checking a box is not insufficient for that reason alone. Checkboxes, sometimes accompanied by the parties' initials, are routinely used in a wide range of important and legally binding documents. Even Connecticut trial courts "routinely use" checkbox forms to issue legally binding orders. *In re Leah S.*, 284 Conn. 685, 687 n.2, 935 A.2d 1021 (2007). In the context of pre-embryo disposition agreements, several courts have held that the agreements were enforceable when progenitors indicated a disposition choice in some manner other than by writing it out in full. See, e.g., *Terrell* v. *Torres*, supra, 246 Ariz. 316 (progenitors "selected and initialed" next to disposition choice); *Kass* v. *Kass*, supra, 91 N.Y.2d 566–67 (progenitors signed consents indicating their dispositional intent). Moreover, any suggestion that the checkboxes were evidence that the parties had not seriously considered the issue is contradicted by the storage agreement itself and the testimony of both parties.[7]

Third, the trial court's reliance on *Rucker* v. *Rucker*, supra, 2016 WL 7439094, also was misplaced. That case involved a storage agreement between progenitors and a fertility clinic that included a checkbox term providing for " 'transfer' " of the pre-embryos upon divorce. Id., *9. The Minnesota Court of Appeals held that the trial court had misinterpreted the word "transfer." Id., *10. The appeals court then provided the correct interpretation and remanded the case to the trial court to decide how the pre-embryos should be distributed in light of this new interpretation. Id., *11. The court did not even remotely suggest that the checkbox nature of the agreement was relevant (much less significant), as the trial court did in this case. See id., *9–11.

Therefore, we conclude that the parties had an

enforceable agreement.

Because we determine that there was an enforceable contract, the defendant's claims that, *in the absence of a contractual agreement*, a pre-embryo is not "property" under § 46b-81 because it is a human life or, if it is "property," that a trial court should employ a presumption in favor of its preservation because it is a human life, necessarily fail. The defendant's claims presuppose that there was no enforceable contract. The defendant does not argue that if there is an enforceable contract, there should be a presumption in favor of preservation. Thus, because we determine that there was an enforceable contract, the defendant's claims that the trial court should have either awarded the pre-embryos to the party seeking to preserve them or applied a presumption in favor of preservation fail.

To the extent that the defendant responds that there is no enforceable contract because, as a general matter of law, any agreement providing for the disposition of a pre-embryo, which constitutes human life, is unenforceable, the claim is not reviewable because it was not preserved at trial, and, therefore, we lack an adequate record to address it. See footnotes 5 and 8 of this opinion. The defendant did not argue at trial that the agreement was unenforceable because it concerned a human life. Even if we generously construe his testimony as legal argument, we conclude that he did not broach this issue. Rather, his sole point was that he should be permitted to change his mind. Nor does he even appear to make this argument on appeal other than through his general contention that a pre-embryo is a human being.

Whether a pre-embryo is a human being is, at least in part, a question of fact. It is certainly not a question an appellate court can determine without some measure of fact-finding.[8] The defendant concedes this. Nevertheless, he offered no evidence at trial to establish it. Further, to the extent that this claim might implicate constitutional rights, it would be reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third condition of *Golding*); only if it were supported by an adequate record. For the reasons just stated, however, it is not supported by an adequate record. Accordingly, we decline to review this claim.

IV

We make two additional points to clarify the scope of our holding. First, our decision applies to contracts that, if enforced, will not result in procreation. We do not decide whether the contractual approach applies in a scenario that would force one party to become a genetic parent against his or her wishes or, if the contractual approach does apply, whether such a contract would be unenforceable for other reasons, includ-

ing public policy.

Second, because we conclude that the parties in this case had an enforceable agreement, we do not decide what a court must do in the absence of an enforceable agreement. For example, we leave for another day whether, in the absence of an enforceable agreement, balancing or contemporaneous mutual consent is the appropriate approach, and what the details of such an approach would entail.

The judgment is reversed insofar as the trial court determined that the parties' storage agreement is not enforceable, the trial court's order awarding the pre-embryos to the plaintiff is vacated, and the case is remanded with direction to order the disposition of the pre-embryos in accordance with the storage agreement; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

[1] Although the parties did not introduce any scientific evidence at trial, like other courts, we take judicial notice of the following basic facts of in vitro fertilization: "Typically the [in vitro fertilization] procedure begins with hormonal stimulation of a woman's ovaries to produce multiple eggs. The eggs are then removed by laparoscopy or ultrasound-directed needle aspiration and placed in a glass dish, where sperm are introduced. Once a sperm cell fertilizes the egg, this fusion, or pre-zygote, divides until it reaches the four-to-eight cell stages, after which several pre-zygotes are transferred to the woman's uterus by a cervical catheter. If the procedure succeeds, an embryo will attach itself to the uterine wall, differentiate, and develop into a fetus. As an alternative to immediate implantation, pre-zygotes may be cryopreserved indefinitely in liquid nitrogen for later use. Pre-embryo is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. It refers to the approximately 14-day period of development from fertilization to the time when the embryo implants in the uterine wall and the primitive streak, the precursor to the nervous system, appears. An embryo proper develops only after implantation. The term frozen embryos is a term of art denoting cryogenically preserved pre-embryos." (Internal quotation marks omitted.) *McQueen* v. *Gadberry*, 507 S.W.3d 127, 134 n.4 (Mo. App. 2016).

[2] The parties were aware that some of the pre-embryos resulting from the treatment might not be transferred to the plaintiff's uterus immediately and could require storage. The storage agreement with the center, which we will discuss in more detail, informed them: "If numerous eggs are retrieved during our (my) cycle, the number of eggs exposed to sperm will be decided by us (me) and our (my) doctor. If we (I) elect to expose most or all of our (my) eggs to sperm in order to develop as many embryos as possible, any viable embryos not transferred to the uterus will be frozen (cryopreserved). . . . [I]f we (I) have a miscarriage, or if a successful pregnancy does occur but we (I) subsequently desire another child, the frozen embryos will be available to us (me) for thawing and transfer during a subsequent menstrual cycle. This procedure may be repeated until all the frozen embryos have been utilized."

[3] "[A]lternative methods to preembryo destruction that are currently available . . . include preembryo donation for procreation (essentially, a form or preembryo 'adoption') . . . ." O. Lin, "Bioethics and the Disposition of Cryopreserved Preembryos: Why Autonomy-Based Contract Theory Does Not Work," 34 Fam. Advoc. 38, 40 (2011).

[4] General Statutes § 46b-81 provides in relevant part: "(a) At the time of . . . dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the . . . dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The

court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

Although the trial court did not cite § 46b-81, we assume it applied this statute because it considered several of the factors enumerated in that statute and held that the pre-embryos were the "property" of the plaintiff. Regarding § 46b-81, we have stated: "[T]he trial court need not give each factor equal weight . . . or recite the statutory criteria that it considered in making its decision or make express findings as to each statutory factor . . . ." (Internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 355, 880 A.2d 872 (2005).

[5] We note that the defendant's precise concerns on appeal are not clear. He was not represented by counsel in proceedings before the trial court. On appeal, he submitted his principal brief without counsel, and his only request for relief was that this court "certify" his case to the United States Supreme Court as a vehicle for that court's reconsideration of *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). The defendant then retained counsel, who submitted a reply brief on his behalf (which made the claims set forth previously for reversal of the trial court's judgment) and represented him at oral argument before this court. At oral argument, the defendant's counsel also withdrew his client's original request to certify the case to the United States Supreme Court.

The appeal, construed strictly, could be considered moot because this court cannot grant the defendant his only claim for relief. See, e.g., *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 481, 803 A.2d 318 (2002). This court is not capable of granting the defendant's original request for relief, as the United States Supreme Court does not accept certified cases or questions from state courts. Cf. U.S. Sup. Ct. R. 19 ("[a] United States court of appeals may certify to this [c]ourt a question or proposition of law on which it seeks instruction"). This request also was withdrawn. Further, it is well established that we are not obligated to review claims raised for the first time in a reply brief. E.g., *Reardon* v. *Zoning Board of Appeals*, 311 Conn. 356, 367 n.10, 87 A.3d 1070 (2014).

Mindful that we construe our rules of practice liberally, especially when a party is self-represented, we will, in this case, consider the claims that the defendant raised in his reply brief, but only to the extent that they do not prejudice the plaintiff and the record supports our review. See Practice Book § 60-1; *Oliphant* v. *Commissioner of Correction*, 274 Conn. 563, 569, 877 A.2d 761 (2005) ("Connecticut courts [are] to be solicitous of pro se litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the pro se party" [internal quotation marks omitted]). The plaintiff has not asked us to do otherwise.

[6] We also note that intimate partner contracts generally warrant "special scrutiny . . . ." *Bedrick* v. *Bedrick*, supra, 300 Conn. 703. This is justified by, among other things, the nature of these intimate relationships, in which partners tend to be less cautious in contracting with one another than they would be in contracting with others; id.; and by the recognition that events may occur before the dissolution of the relationship that go beyond their contemplation at the time they entered into the agreement. See *McHugh* v. *McHugh*, 181 Conn. 482, 485–86, 436 A.2d 8 (1980). Although we see no abuse of trust (the defendant concedes that he intelligently entered the agreement) or unforeseen circumstances (the parties' agreement expressly contemplates the very event at issue: divorce) in this case that would cause us to hold that the agreement is unenforceable, we recognize that these circumstances could arise in other cases.

[7] The storage agreement provided, just above the parties' selection for disposition upon divorce: "We (I) understand, agree and consent that if we divorce . . . ." (Emphasis omitted.) The plaintiff also testified that she and the defendant had expressly discussed the issue of disposition upon divorce: "When we talked about it, we said, in the event that one of us divorce[s] or we died or anything like that, that we would. And we talked about that. That's when we both signed the contract on the day we went to speak to the center.

\* \* \*

So, then we spoke about them, and then we agreed that should—in case of divorce, you know, whichever party initiated it, that we would do this. So, also the understanding that we agreed upon, that's what we did. . . . We both spoke about—we both talked about it, and then we both signed off on it." The defendant did not expressly confirm that they had discussed disposition upon divorce but conceded that he had agreed to the disposition in the storage agreement because "at the time, I never thought we'd get

divorced, number one; and number two, that's what my wife wanted, and I agreed, because I was trying to do as she wanted." His change of heart only occurred at some point after he had entered the agreement: "In hindsight, I realize it was the wrong thing to do, and I've changed my mind . . . ."

[8] In concluding that we lack an adequate record for review, we are aware of the abundance of information outside the record regarding the science behind in vitro fertilization and on every other aspect of the complex and difficult issues raised in cases in which it is implicated. We also recognize that courts occasionally and to varying degrees have taken judicial notice of this evidence. E.g., *McQueen* v. *Gadberry*, supra, 507 S.W.3d 134 n.4 (considering basic scientific evidence related to pre-embryos, even though "there was no evidence introduced at trial with respect to the science of [in vitro fertilization], related scientific terms, or the division or cell stages of the frozen pre-embryos at issue"). In this light, the defendant notes that "[s]ome argue [that] the question of when human life beings has been definitely answered by scientific knowledge," and his counsel at oral argument before this court suggested that we consider the medical literature referenced by the amicus as evidence of this point. See, e.g., R. Gitchell, "Should Legal Precedent Based on Old, Flawed, Scientific Analysis Regarding When Life Begins, Continue To Apply to Parental Disputes over the Fate of Frozen Embryos, When There Are Now Scientifically Known and Observed Facts Proving Life Begins at Fertilization?" 20 DePaul J. Health Care L. 1, 2 (2018) ("[o]bservable facts of human development can be seen in films of one cell human embryos that were cryopreserved"). But see, e.g., P. Peters, "The Ambiguous Meaning of Human Conception," 40 U.C. Davis L. Rev. 199, 201 (2006) ("[m]ost of the governmental commissions that have studied the propriety of scientific research using early embryos have concluded that embryos less than two weeks old are not moral persons").

We note, however, the fundamental difference between establishing the facts of fertilization and establishing that human life begins at fertilization. We cannot seriously consider the latter issue on a record devoid of any evidence whatsoever and with an argument aimed only at one facet of this "difficult question . . . ." *Roe* v. *Wade*, 410 U.S. 113, 159, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973); see id. ("We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.").

––––––––––––––––––––––––